T.C. Memo. 2013-209

UNITED STATES TAX COURT

ACUITY, A MUTUAL INSURANCE COMPANY, AND SUBSIDIARIES,
Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9421-11.  Filed September 4, 2013.

Held: Evidence that insurance company A's loss reserves (1) were actuarially computed in accordance with the rules of the National Association of Insurance Commissioners (NAIC) and the Actuarial Standards of Practice (ASOPs) and (2) fell within a range of reasonable reserve estimates as determined by A's appointed actuary in accordance with the ASOPs is highly probative in establishing that A's loss reserves are fair and reasonable and represent only actual unpaid losses within the meaning of sec. 1.832-4(a)(14) and (b), Income Tax Regs.

Held, further, A's carried loss reserves of $660,639,385 for 2006 are fair and reasonable and represent only actual unpaid losses.

**[*2]**   Michael M. Conway, Richard F. Riley Jr., George R. Goodman, and

Katherine D. Spitz, for petitioner.

Alan M. Jacobson, Laurie A. Nasky, and Jan E. Lamartine, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


VASQUEZ, Judge:  Respondent determined deficiencies of $1,072,933 for

2005 and $30,678,144 for 2006 in the Federal income tax of Acuity, A Mutual

Insurance Company (Acuity), and Subsidiaries (collectively, petitioner).  After

concessions,[1] the sole issue remaining for decision is whether Acuity's yearend

reserves for unpaid losses and loss adjustment expenses (carried loss reserves) of

$660,639,385 for 2006, as used in computing "losses incurred" within the

meaning of section 832(b)(5),[2] are a "fair and reasonable" estimate and represent

---

[1]  In the notice of deficiency, respondent disallowed petitioner's claimed deductions for guaranty fund expenses in the amounts of $3,065,523 and $222,250 for 2005 and 2006, respectively.  Respondent now concedes that petitioner is entitled to these deductions.

[2]  Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All amounts are rounded to the nearest dollar.

**[\*3]** "only actual unpaid losses" within the meaning of section 1.832-4(a)(14) and (b), Income Tax Regs.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, and the accompanying exhibits are incorporated herein by this reference.

I.     Background on Acuity

Petitioner is a group of corporations that filed consolidated Federal income tax returns for 2006. Acuity is the common parent of the consolidated group.[3] Acuity is a mutual property and casualty insurance company organized as a corporation under the laws of the State of Wisconsin.[4] In 2006 Wisconsin was Acuity's State of domicile and principal place of business.

In the decade before 2006 Acuity's mix of business changed dramatically. In 1997 Acuity's written premiums of approximately $229 million were divided

---

[3] Acuity was incorporated on August 11, 1925, as the Mutual Automobile Insurance Company of the Town of Herman. It changed its name in May 1954 to Mutual Auto Insurance Company of Wisconsin and again in December 1957 to Heritage Mutual Insurance Company. It adopted its present name of Acuity in June 2001. For convenience of the reader, we henceforth refer to the company as Acuity regardless of the legal name of the company in effect at the time of the event described.

[4] Acuity is owned by its policyholders.

[*4] almost equally between personal lines and commercial lines. Acuity wrote approximately 71% of the premiums in Wisconsin and the remaining approximately 29% in 11 other States: Illinois, Indiana, Iowa, Kentucky, Michigan, Minnesota, Nebraska, North Dakota, Ohio, South Dakota, and Tennessee.

In the following years Acuity experienced tremendous growth, far in excess of the property and casualty insurance industry averages. Acuity's written premiums grew by an average of 13.3% for the five-year period 1997-2001 compared to the industry average of 3.9% as reported on Acuity's Annual Report for 2001. Acuity continued posting double-digit growth each year from 2002 to 2004. Acuity's growth tapered off in 2005 and 2006 to 9.3% and 6.1%, respectively, but at the same time, industry growth was just 0.7% and 2.0% for those two years as reported on Acuity's Annual Report for 2006. All in all, Acuity's written premiums of approximately $803 million in 2006 had more than tripled from 1997.

Acuity's mix of business changed dramatically both by State and by line of insurance. Acuity's written premiums in Tennessee grew from $186,147 in 2000 to over $18 million in 2006. Acuity's written premiums increased almost 5-fold in Illinois and more than 18-fold in Michigan during this same time period. Other

**[*5]** States saw more modest increases and some saw year-to-year decreases. Acuity's written premiums decreased in Ohio in 2004 and 2005 and decreased in Indiana, Minnesota, Nebraska, and Wisconsin in 2006. Acuity also entered some new States. It began writing insurance in Missouri in 2004 and in Arizona and Kansas in 2006.

In its home State of Wisconsin, Acuity's written premiums grew from approximately $199.6 million in 2000 to approximately $328.2 million in 2006, an average annual growth rate of almost 9%. However, as a percentage of its total written premiums, Acuity's written premiums in Wisconsin decreased every year from 2000 to 2006. This is so because Acuity was growing at an even faster rate in other States. In 2006 Acuity wrote approximately 40.9% of its total premiums in Wisconsin compared to approximately 60.1% in 2000 and approximately 71% in 1997. The composition of the premiums had also changed from an approximately 50-50 split between commercial and personal lines in 1997. Acuity's growth rate in commercial lines was much faster than in personal lines, so much so that in 2006 Acuity wrote approximately 80% of its total premiums in commercial lines and only approximately 20% in personal lines.

The following table shows Acuity's written premiums for 2006 for each of the 15 States in which it did business:

| [*6] State | Written premiums | Percentage of total |
|---|---|---|
| Arizona | $8,971,950 | 1.1 |
| Illinois | 114,379,204 | 14.2 |
| Indiana | 37,362,359 | 4.7 |
| Iowa | 43,238,597 | 5.4 |
| Kansas | 3,017,995 | 0.4 |
| Kentucky | 19,856,868 | 2.5 |
| Michigan | 33,839,133 | 4.2 |
| Minnesota | 61,131,468 | 7.6 |
| Missouri | 31,269,247 | 3.9 |
| Nebraska | 13,933,303 | 1.7 |
| North Dakota | 12,365,939 | 1.5 |
| Ohio | 45,047,564 | 5.6 |
| South Dakota | 31,602,368 | 3.9 |
| Tennessee | 18,970,695 | 2.4 |
| Wisconsin | 328,194,668 | 40.9 |
| Total | 803,181,358 | 100.0 |

II.   Lines of Insurance

Acuity writes policies in many different lines of insurance.  The following table shows Acuity's written premiums for 2006 by line of insurance as a percentage of its total premiums as reported on Acuity's Annual Statement for 2006:

| [*7] Annual statement lines | Percentage of total premiums[1] |
|---|---|
| Fire | 2.7 |
| Allied lines | 2.0 |
| Homeowners multiple peril | 5.3 |
| Commercial multiple peril | 9.8 |
| Inland marine | 3.1 |
| Workers compensation | 29.8 |
| Other liability-occurrence | 10.6 |
| Products liability-occurrence | 1.3 |
| Private passenger auto liability | 8.0 |
| Commercial auto liability | 14.5 |
| Auto physical damage | 12.2 |
| Fidelity | 0.1 |
| Surety | -0- |
| Burglary & theft | -0- |
| Boilery & machinery | 0.4 |

[1] Percentages do not add up to 100% because of rounding.

Acuity's insurance policies are written on an occurrence basis (as opposed to a claims made basis). An insured is covered under an occurrence-based policy if a covered event (i.e., an accident or injury) giving rise to a claim occurs during the period the policy is in effect. In other words, coverage depends upon the date of the covered event and not the date on which an insured files a claim. In some

**[*8]** cases, Acuity may not even realize that it faces potential exposure until many years later.[5]

A line of insurance can be classified as short tail coverage or long tail coverage. Short tail coverage refers to a line of insurance in which claims are generally less complicated and faster to resolve. Auto physical damage and the property damage components of homeowners multiple peril and commercial multiple peril are generally short tail coverages because the extent of damage to property (i.e., an automobile, home, or building) can often be assessed quickly and quantified accurately. Claims are often closed within a relatively short time.

In contrast, long tail coverage generally refers to more complicated claims that can stay open for months or even years. These claims may involve damages that are not readily observable or injuries that are difficult to ascertain. Workers compensation, which constitutes nearly 30% of Acuity's business by written premiums, is generally long tail coverage because of the inherent uncertainty in determining the extent of an injured worker's need for medical treatment and loss

---

[5] As discussed <u>infra</u>, events giving rise to a claim which have already occurred but have not yet been reported to an insurance company are known as "incurred but not reported" (IBNR).

[*9] of wages for time off work.[6]  Other long tail coverage lines of insurance include products liability-occurrence, other liability-occurrence, private passenger auto liability, commercial auto liability, and the portion of homeowners multiple peril and commercial multiple peril covering liability.  Acuity both indemnifies its policyholders and provides them with a legal defense.

III.     Insurance Company Loss Reserves

The insurance industry is unique in that a consumer pays an insurance company upfront in exchange for a promise of performance if and when a covered event giving rise to claim occurs.  At the point of sale the insurance company does not know whether it will be called upon to fulfill its promise, when that might happen, or what that might cost.  Loss reserves are the standard means for managing this uncertainty and for ensuring that an insurance company has sufficient resources to meet its obligations.

---

[6] Consider, for example, a young worker who suffers a back injury on the job and undergoes an operation.  If the operation is successful, then the worker may be back to work in a matter of days.  But there is a possibility that the operation may be unsuccessful.  Complications might arise necessitating further treatment.  In some cases the worker may require treatment for his or her entire life, and thus Acuity may face exposure for decades.  Moreover, on occasion Acuity has to reopen closed claims because, for instance, a worker's condition unexpectedly worsens or a new medical procedure becomes available.

**[*10]** Loss reserves are an estimate of an insurance company's unpaid losses[7]

and loss adjustment expenses (LAE).[8] In this context, losses refer to the dollar

amounts that an insurance company has paid or will pay to claimants. Losses do

not indicate that an insurance company is unprofitable. Losses are reduced by

salvage and subrogation (S & S)[9] recoveries. Unpaid losses are equal to the sum

of an insurance company's case reserves[10] and IBNR.[11] Unpaid losses can also be

---

[7] Unpaid losses are the future amounts that an insurance company expects to pay on claims existing as of a given date.

[8] LAE are the costs of administering claims. LAE comprise two components: (1) allocated loss adjustment expenses (ALAE) and (2) unallocated loss adjustment expenses (ULAE). ALAE are LAE that are directly attributable to individual claims, such as the costs of a medical examination or defense attorney. ULAE are LAE that are not directly attributable to individual claims, such as the overhead of the claims department.

[9] Salvage is an amount that an insurer has recovered or expects to recover from damaged property that it has obtained through the process of compensating a claimant. Subrogation is an amount that an insurer has recovered or expects to recover from a third party who has some responsibility for causing damage to an insured for which the insurer compensated the insured.

[10] Case reserves are estimates of unpaid amounts for claims established by a claims department for known and reported claims.

[11] IBNR is an estimate of the ultimate cost of claims that have not yet been reported to an insurer, plus an estimate of the inadequacy or redundancy of the case reserves.

[*11] expressed as the difference between ultimate losses[12] and paid losses.[13] Loss reserves are commonly computed by estimating ultimate losses and LAE and then subtracting paid losses and LAE. Reinsurance recoveries are subtracted from loss reserves computed on a direct or gross basis to arrive at loss reserves on a net basis.

Loss reserves are a liability on an insurance company's balance sheet.[14] An insurance company is required to set aside liquid assets such as cash and investments to back its loss reserves. There are statutory restrictions as to the type of these assets and the manner in which they can be invested.

Adverse consequences can result if an insurance company sets its loss reserves too low or too high. Underreserving accounts for more than 40% of all insolvencies in the past four decades. Underreserving can lead to downgrades by ratings agencies, loss of customers, and regulatory action. Overreserving limits the capital an insurance company can use for other purposes, such as growth,

---

[12] Ultimate losses are an estimate of the total amount that an insurance company expects to pay on claims existing as of a given date. Ultimate losses include amounts that have already been paid and amounts that have not yet been paid.

[13] Paid losses are the amounts that an insurance company has already paid on claims existing as of a given date. Paid losses are known amounts.

[14] Acuity's loss reserves for 2006 were its largest liability.

**[*12]** acquisitions, new product development, or geographic expansions. Moreover, overreserving reduces the surplus of an insurance company, making it appear less profitable.

Actuarial estimates are inherently uncertain because they are dependent on future contingent events. The challenge of loss reserving is to predict not only the incidence of unreported claims, but also the factors influencing the losses on known claims. Actuarial science and statutory accounting provide a framework for loss reserving.

IV.    Actuarial Science

Actuarial science is the study of the financial costs of risk and uncertainty, involving the application of mathematics, statistics, and financial theory to assess the risk that an event will occur and to estimate the ultimate financial cost of events or liabilities, such as insured events under an insurance company's policies. Actuarial science recognizes specific accepted methodologies for computing insurance company loss reserves. Actuaries are credentialed professionals whose work involves the application of the recognized standards of actuarial science.

To become an actuary in the United States, an individual needs at minimum a bachelor's degree and must pass a rigorous series of exams administered by a professional society. The Casualty Actuarial Society (CAS) is the professional

[*13] society for actuaries who work in the property and casualty insurance industry. An aspiring actuary must pass seven certification exams to become an Associate of the CAS and nine certification exams to become a Fellow of the CAS (FCAS). A credentialed actuary may also become a Member of the American Academy of Actuaries (MAAA).

The Actuarial Standards Board (ASB) is vested by the professional actuarial societies with the responsibility for promulgating Actuarial Standards of Practice (ASOPs) for actuaries providing professional services in the United States. Actuaries are required to follow the ASOPs by their actuarial societies. In June 2007 the ASB adopted ASOP 43, Property/Casualty Unpaid Claim Estimates, with an effective date of September 1, 2007. ASOP 43 provides guidance to actuaries in performing professional services relating to the estimating of unpaid losses and LAE for property and casualty insurance companies. From May 1988 until June 2007, the Statement of Principles Regarding Property and Casualty Loss and Loss Adjustment Expense Reserves (CAS Statement of Principles), as adopted by the board of directors of the CAS, served as the primary guidance relating to the estimating of unpaid losses and LAE for property and casualty insurance companies. The CAS Statement of Principles states in relevant part:

**[\*14]**  PRINCIPLES

1.  An actuarially sound loss reserve for a defined group of claims as of a given valuation date is a provision, based on estimates derived from reasonable assumptions and appropriate actuarial methods, for the unpaid amount required to settle all claims, whether reported or not, for which liability exists on a particular accounting date.

2.  An actuarially sound loss adjustment expense reserve for a defined group of claims as of a given valuation date is a provision, based on estimates derived from reasonable assumptions and appropriate actuarial methods, for the unpaid amount required to investigate, defend and effect the settlement of all claims, whether reported or not, for which loss adjustment expense liability exists on a particular accounting date.

3.  The uncertainty inherent in the estimation of required provisions for unpaid losses or loss adjustment expenses implies that a range of reserves can be actuarially sound.  The true value of the liability for losses or loss adjustment expenses at any accounting date can be known only when all attendant claims have been settled.

4.  The most appropriate reserve within a range of actuarially sound estimates depends on both the relative likelihood of estimates within the range and the financial reporting context in which the reserve will be presented.

V.      Statutory Accounting for Insurance Companies

The National Association of Insurance Commissioners (NAIC) is an organization of insurance regulators from all 50 States, the District of Columbia, and five U.S. territories.  The NAIC is a forum for regulators to coordinate regulatory efforts and to develop uniform regulatory policy, where uniformity is

[*15] appropriate. The NAIC describes itself as the United States' standard-setting and regulatory support organization for the insurance industry. The NAIC promulgates a standard financial statement form known as the Annual Statement.

Insurance companies in Wisconsin are regulated by the Wisconsin Office of the Commissioner of Insurance (WOCI). Acuity is subject to regulation and oversight by the WOCI. Wisconsin does not have its own Annual Statement instructions. Instead, insurance companies domiciled in Wisconsin (as is Acuity) are required to use the NAIC instructions for the Annual Statement. Changes in the Annual Statement form made by the NAIC are automatically adopted in Wisconsin.

Annual Statements are required to be prepared on the basis of statutory accounting principles (SAP).[15] These accounting principles are specifically made applicable to insurance companies under State law. Accuracy and completeness of the Annual Statements are critical to States' ability to meaningfully monitor insurance companies' financial condition, including solvency. Annual Statements are also reviewed and relied upon by customers, investors, insurance agents, financial rating organizations, and other insurance industry participants as a report of an insurance company's financial condition.

---

[15] Annual Statements are not prepared on the basis of generally accepted accounting principles (GAAP).

**[*16]**    Annual Statements are filed with the applicable State insurance regulators and are public documents.  They are signed by officers of insurance companies under penalty of perjury.  Acuity is required to file an Annual Statement of its financial condition and quarterly statements with the WOCI and with each State in which it does business.[16]  In addition, Acuity is required to file a statement of actuarial opinion prepared and signed by a qualified actuary.  This qualified actuary is known as the appointed actuary.  ASOP 36, Statements of Actuarial Opinion Regarding Property/Casualty Loss and Loss Adjustment Expense Reserves (March 2000), provides guidance to the appointed actuary in preparing the statement of actuarial opinion.[17]

NAIC statutory accounting practices and procedures are set forth in the Accounting Practices and Procedures Manual (AP&P Manual), which is sometimes referred to as a "codification".  The AP&P Manual is used as the reporting standard for Annual Statements in Wisconsin.  Statements of Statutory Accounting

---

[16]  The Annual Statement must be filed with the WOCI on or before March 1.

[17]  The ASB adopted ASOP 36 in March 2000 with an effective date of October 15, 2000.  The ASB adopted a revised edition of ASOP 36 in December 2010 with an effective date of May 1, 2011.  The revised edition provides additional clarity and guidance and eliminates redundant language and guidance that existed between the earlier version of ASOP 36 and ASOP 43.  References to ASOP 36 are to the version adopted in March 2000 except as otherwise noted.

**[*17]** Principles (SSAPs) are pronouncements of accounting rules adopted by the NAIC and are included in the AP&P Manual. SSAP No. 55 entitled "Unpaid Claims, Losses and Loss Adjustment Expenses" states, among other things, that "management [of an insurance company] shall record its best estimate of its liabilities for unpaid claims, unpaid losses, and loss/claim adjustment expenses."

VI.     The Computation of Acuity's Loss Reserves for 2006

Benjamin M. Salzmann is Acuity's president and chief executive officer. He is not an actuary. He did not attempt to compute Acuity's loss reserves for 2006 (or for any other year). Instead, he and other members of Acuity's management deferred to and relied upon the professional judgment of Acuity's three fully credentialed actuaries on staff, led by Patrick Tures, FCAS, MAAA.

Mr. Tures graduated from St. Norbert College in De Pere, Wisconsin, in 1987 with degrees in mathematics and business administration. Right after college he started his actuarial career at Acuity as a pricing analyst. While at Acuity he began taking the certification exams administered by the CAS. In 1990 he moved to Kemper Insurance. He worked there for 12 years, rising in the ranks from actuarial analyst to assistant manager to manager to director. In 1995 he passed the last of the certification exams and became an FCAS. Soon after he became an MAAA.

**[*18]**   In 2002 Mr. Tures returned to Acuity as its vice president--actuarial and strategic information, the same position that he held in 2006 and as of the date of trial.  Working with Sarah Kemp, FCAS, MAAA, Associate Actuary; Cathy Staats, FCAS, MAAA, Actuary; and Nathan Baseman, Actuarial Analyst, Mr. Tures prepared Acuity's actuarial data and reserve analysis for 2006.  He computed Acuity's loss reserves for 2006 both on a quarterly basis and at yearend.

Mr. Tures produced approximately 900 pages of actuarial analysis in performing his loss reserve computations.  He used eight separate actuarial methods to compute Acuity's estimated ultimate losses.[18]  The eight methods are the:  (1) paid development method; (2) incurred development method; (3) paid Bornhuetter-Ferguson (BF) method using ultimate premiums and an expected loss ratio; (4) incurred BF method using ultimate premiums and an expected loss ratio; (5) paid BF method using ultimate counts and expected severity; (6) incurred BF method using ultimate counts and expected severity; (7) paid method using a weighted average; and (8) incurred method using a weighted average.  Mr. Tures

---

[18]   The CAS Statement of Principles states:  "Selection of the most appropriate method of reserve estimation is the responsibility of the actuary.  Ordinarily the actuary will examine the indications of more than one method when estimating the loss and loss adjustment expense liability for a specific group of claims."

[*19] also performed computations under the Brosius method, but in his professional judgment he decided not to rely upon any of those computations.

The starting point for each of the eight methods is actual data. Where appropriate, Mr. Tures used Acuity's historical data. He and his staff had complete access to Acuity's claims, underwriting, marketing, and sales data. In States where Acuity lacked sufficient historical data, he consulted industry data. However, he did not uncritically substitute industry data in place of Acuity's historical data. Instead, he used his best professional judgment in adjusting the industry data and development patterns to account for Acuity's trends.[19]

Each of the eight methods then calls for the selection of various inputs.[20] Unlike the actual data that enters into the methods, the inputs are, by and large, estimated or projected figures selected on the basis of an actuary's assumptions and judgment. The inputs and the manner in which they are used vary from method to method. For example, the paid development method and the incurred development

---

[19] The adjustments resulted in lower loss reserves than would have been the case had Mr. Tures used the industry data without adjustments.

[20] We use the term "inputs" to refer generally to figures an actuary selects for use in an actuarial method.

[*20] method use loss development factors[21] to estimate ultimate losses. The paid BF method using ultimate premiums and an expected loss ratio and the incurred BF method using ultimate premiums and an expected loss ratio use loss development factors from the paid development method and the incurred development method, respectively, and a weighting between actual losses and expected losses to estimate ultimate losses. The paid BF method using ultimate claim counts and expected severity and the incurred BF method using ultimate claim counts and expected severity use projected ultimate claim counts and projected ultimate severity to estimate ultimate losses.

Mr. Tures used his best professional judgment in selecting inputs, taking into account Acuity's changing mix of business, rapid growth, evolving claims patterns,[22] increasing litigation costs,[23] and other factors.[24] He computed estimated

---

[21] Development is defined as the change between dates in the observed value of some quantity. A loss development factor is a ratio of losses as of one valuation date to losses as of another valuation date.

[22] The frequency (the number of claims per exposure unit of payroll) of workers compensation claims at Acuity was decreasing but the severity (the average payment on each claim) was increasing.

[23] For example, in Illinois, where Acuity's business was rapidly increasing, a greater percentage of claims resulted in litigation as than in Wisconsin.

[24] The CAS Statement of Principles states: "Understanding the trends and changes affecting the data base is a prerequisite to the application of actuarially

(continued...)

[*21] ultimate losses using each method for each of Acuity's lines of insurance.[25]

For some lines, and in particular those with short tail coverages, the methods

---

[24](...continued)
sound reserving methods. A knowledge of changes in underwriting, claims handling, data processing and accounting, as well as changes in the legal and social environment, affecting the experience is essential to the accurate interpretation and evaluation of observed data and the choice of reserving methods."

[25] Mr. Tures organized Acuity's data into 10 lines of insurance for the reserving process. The following table shows those lines and the corresponding lines as presented on Acuity's Annual Statement for 2006:

| Acuity's lines of insurance | Annual statement lines of insurance |
|---|---|
| Homeowners | Homeowners multiple peril |
| Workers compensation | Workers compensation |
| Business Package (Bis-Pak) | Commercial multiple peril |
| Commercial auto liability | Commercial auto liability |
| Commercial auto physical damage | Auto physical damage |
| General liability | Products liability-occurrence; Other liability-occurrence |
| Property, inland marine, glass, crime, surety and fidelity | Fire; allied lines; inland marine; fidelity; surety; burglary and theft; boiler and machinery |
| Umbrella | Other liability-occurrence |
| Personal auto liability | Private passenger auto liability |
| Personal auto physical damage | Auto physical damage |

**[\*22]** produced similar outputs.[26]  For example, for Acuity's commercial auto physical damage line, the lowest output was an estimated ultimate loss of $27,971,596 while the highest output was an estimated ultimate loss of $28,904,742 for accident year 2006.  For other lines, and in particular those with long tail coverages, the outputs of the methods varied considerably.  For example, for Acuity's umbrella line, the lowest output was an estimated ultimate loss of $283,988 while the highest output was an estimated ultimate loss of $33,429,330 for accident year 2006.

Mr. Tures likewise used his best professional judgment in selecting estimated ultimate losses from the outputs of the eight methods.  His selection techniques, varying by accident year and line of insurance, included taking the simple average of the outputs of all eight methods, the weighted average of the outputs of two or more methods, and the output of a particular method.  For the more recent accident years, where the data is immature, he placed greater reliance upon the BF methods.  He arrived at total expected[27] estimated ultimate losses of $2,694,363,797 as of yearend for 2006.

---

[26]  We use the term "outputs" to refer generally to the results produced by an actuarial method.

[27]  Mr. Tures used the terms "expected" and "selected" synonymously in referring to his best estimates.

[*23] Mr. Tures used three actuarial methodologies[28] in computing estimated ultimate ALAE and anticipated ultimate S & S.  As was the case with estimated ultimate losses, Mr. Tures used his best professional judgment in selecting inputs to and outputs from the methods.  He arrived at total expected estimated ultimate ALAE of $231,549,614 and total expected anticipated ultimate S & S of ($143,706,661) as of yearend for 2006.  He added the total expected estimated ultimate losses, total expected estimated ultimate ALAE, and ULAE reserves, netted out the total expected anticipated ultimate S & S, and subtracted the paid losses and LAE to arrive at expected loss reserves of $716,097,187 on a direct basis for 2006.  He subtracted ceded reserves attributable to reinsurance recoveries of $55,457,797 from the expected loss reserves of $716,097,187 on a direct basis to arrive at expected loss reserves of $660,639,385 on a net basis for 2006.[29]

---

[28]  He used the paid ALAE development method, the paid ALAE to paid loss development method, and the BF method in computing his estimated ultimate ALAE.  He used the paid S & S method, the paid S & S to paid loss development method, and the BF method in computing his anticipated ultimate S & S.

[29]  Three sheets in Mr. Tures' workpapers showing reconciliation to schedule P of the Annual Statement, a reserve review, and reserve ranges show Acuity's loss reserves as $660,639,379, $660,639,387, and $660,639,390, respectively.  The record does not reflect what the small differences in these reserve amounts are attributable to (they may be attributable to rounding).  We find that these small differences are de minimis.  We further find that Mr. Tures' best estimate for Acuity's loss reserves was $660,639,385, the average of the three

(continued...)

[*24]  In addition to his expected loss reserves, Mr. Tures computed a loss reserve range and loss reserves under two hypothetical scenarios.  He selected the outputs of the methods that produced in the aggregate across all accident years and lines of insurance the lowest and highest estimated ultimate losses, estimated ultimate ALAE, and anticipated ultimate S & S, in computing the lower and upper bounds, respectively, of the loss reserve range.[30]  He arrived at a loss reserve range of $565,993,168 to $723,239,532 on a net basis for 2006.[31]  In a process he called "scenario testing", Mr. Tures modified his selection of inputs in the methods to compute loss reserves under two hypothetical scenarios reflecting assumptions that were more favorable (optimistic scenario) and less unfavorable (pessimistic scenario) to Acuity than those used in computing his expected loss reserves.  He computed the loss reserves under the optimistic and pessimistic scenarios independently of his expected loss reserves using the same methods but with

_____

[29](...continued)
amounts and the amount that Acuity's management adopted and reported on its Annual Statement for 2006.  See infra pp. 25-26, 31.

[30]  Because S & S reduces losses, Mr. Tures used the lowest anticipated ultimate S & S in computing the upper bound of the loss reserve range and vice versa.

[31]  The loss reserve range would have been much wider had Mr. Tures selected the lowest or highest output for each accident year or line of insurance separately.

[*25] different inputs. He arrived at loss reserves of $600,581,261 under the optimistic scenario and loss reserves of approximately $714 million under the pessimistic scenario.[32] The following table shows the loss reserves Mr. Tures computed for 2006:

| Net loss reserves | Amount |
| --- | --- |
| Lower bound of range | $565,993,168 |
| Optimistic scenario | 600,581,261 |
| Best estimate/expected | 660,639,385 |
| Pessimistic scenario | 714,000,000 |
| Upper bound of range | 723,239,532 |

VII.    Acuity's Management Approves Mr. Tures' Expected Loss Reserves

Mr. Tures submitted to Acuity's management his expected loss reserves of $660,639,385 for approval. His expected loss reserves were his best estimate of the amount Acuity would ultimately be expected to pay for all losses, including LAE, over the amount it had already paid as of yearend 2006. In his professional opinion, his expected loss reserves made a reasonable provision for Acuity's unpaid losses and LAE.[33] He did not request management's approval for any other

---

[32] The record does not reflect the exact amount Mr. Tures computed for the loss reserves under the pessimistic scenario.

[33] Mr. Tures did not consider Federal income tax consequences in his loss reserve analysis.

[*26] loss reserve amount, nor did management suggest that he do so. Management approved of his expected loss reserves of $660,639,385 and adopted that amount without change as Acuity's carried loss reserves for 2006.[34]

VIII.    Independent Analysis of Acuity's Loss Reserves

As part of his "systematic checks and balances", Mr. Salzmann had an outside consulting actuary independently review Acuity's loss reserves each year and prepare a statement of actuarial opinion. Acuity's board of directors selected John R. Kryczka as Acuity's appointed actuary for 2006.

Mr. Kryczka is an FCAS, a Fellow of the Canadian Institute of Actuaries (FCIA), and an MAAA. He has worked in the insurance industry since 1983 with a concentration primarily in property and casualty insurance. In November 1992 he joined the accounting firm of PricewaterhouseCoopers LLP (PwC) as a senior consulting actuary.[35] In 2006 he was a director at PwC, and he had been promoted to managing director by the time of trial.

The purpose of Mr. Kryczka's engagement was to determine whether Acuity's carried loss reserves of $660,639,385 (i.e., Mr. Tures expected loss

---

[34]  Carried loss reserves are the loss reserves reported by an insurance company on its Annual Statement.

[35]  The accounting firm was known as Coopers & Lybrand at the time.

**[*27]** reserves as adopted by Acuity's management) fell within a range of reasonable reserve estimates.[36] Mr. Kryczka was not asked to opine on a particular amount that he believed Acuity should report as its carried loss reserves.[37] Under ASOP 36, sec. 3.3.2, Mr. Kryczka could issue one of five types of opinions:

> a. Determination of Reasonable Provision--When the stated reserve amount is within the actuary's range of reasonable reserve estimates (see section 3.6.4), the actuary should issue a statement of actuarial opinion that the stated reserve amount makes a reasonable provision for the liabilities associated with the specified reserves.
>
> b. Determination of Deficient or Inadequate Provision--When the stated reserve amount is less than the minimum amount that the actuary believes is reasonable, the actuary should issue a statement of actuarial opinion that the stated reserve amount does not make a reasonable provision for the liabilities associated with the specified reserves. * * *
>
> c. Determination of Redundant or Excessive Provision--When the stated reserve amount is greater than the maximum amount that the actuary believes is reasonable, the actuary should issue a statement of actuarial opinion that the stated reserve amount does not make a reasonable provision for the liabilities associated with the specified reserves. * * *

---

[36] ASOP 36, sec. 3.6.4, states in relevant part: "The actuary may determine a range of reasonable reserve estimates that reflects the uncertainties associated with analyzing the reserves. A range of reasonable estimates is a range of estimates that could be produced by appropriate actuarial methods or alternative sets of assumptions that the actuary judges to be reasonable."

[37] ASOP 36, sec. 3.3, states in relevant part: "The actuary should document the scope and intended use of the statement of actuarial opinion."

[*28]  d. Qualified Opinion--When, in the actuary's opinion, the reserves for a certain item or items are in question because they cannot be reasonably estimated or the actuary is unable to render an opinion on those items, the actuary should issue a qualified statement of actuarial opinion.  Such a qualified opinion should state whether the stated reserve amount makes a reasonable provision for the liabilities associated with the specified reserves, <u>except for</u> the item, or items, to which the qualification relates.  * * *

e. No Opinion--The actuary's ability to give an opinion is dependent upon data, analyses, assumptions, and related information that are sufficient to support a conclusion.  If the actuary cannot reach a conclusion due to deficiencies or limitations in the data, analyses, assumptions, or related information, then the actuary may issue a statement of no opinion.  * * *

Mr. Kryczka performed an independent actuarial analysis of Acuity's loss reserves for 2006 spanning approximately 900 pages.  Acuity provided Mr. Kryczka with its actual data--the same data that Mr. Tures used in his analysis.[38]  Acuity did not dictate to Mr. Kryczka what actuarial methods to use or what assumptions to make.  Mr. Kryczka and his team met with Acuity's actuarial team and its management, including Mr. Salzmann and the vice presidents of claims, personal lines, and commercial lines, to better understand the changes that were

---

[38]  Mr. Kryczka did not have access to Mr. Tures' workpapers in performing his actuarial analysis or in issuing his statement of actuarial opinion for 2006.  He could not recall whether he received Mr. Tures' workpapers afterwards.

**[\*29]** taking place within Acuity.[39] Mr. Kryczka then used his own professional judgment in determining appropriate actuarial methods to use and selecting inputs to and outputs from the methods.[40]

---

[39] ASOP 36, sec. 3.5.2, states in relevant part:

The actuary should consider the likely effect of changing conditions on the subject loss and loss adjustment expense reserves. The actuary should consider whether there have been significant changes in conditions particularly with regard to claims, losses, or exposures that are new or unusual and that are likely to be insufficiently reflected in the experience data or in the assumptions used to estimate loss and loss adjustment expense reserves. * * *

[40] ASOP 36, sec. 3.5, states in relevant part:

The appropriate type and extent of reserve analysis will vary with the nature of the claims and exposures, the historical pattern of loss development, and the expectation of future conditions as they affect the liabilities associated with unpaid losses and loss adjustment expenses. A number of reserve analysis methods are available to and are used by actuaries. Selection of specific methods, a modification of such methods, or the development of new methods, should be based on an understanding of the nature of the claims, the development characteristics associated with these claims, and the applicability of various methods to the available data. * * *

Mr. Kryczka used the (1) paid loss development method, (2) incurred loss development method, (3) BF method using ultimate premiums and paid loss, and (4) BF method using ultimate premiums and incurred loss to compute estimated ultimate losses. He used the (1) paid ALAE development method, (2) BF method using ultimate loss and paid ALAE, and (3) ratio of incremental paid ALAE to paid loss method to compute estimated ultimate ALAE. He used the (1) S & S development method and (2) BF method using ultimate loss and S & S to compute

(continued...)

[*30] Mr. Kryczka computed a point estimate[41] of $607,482,000 and a narrow range of reasonable reserve estimates from $577,108,000 to $661,329,000 around the point estimate using a PwC process known as Actuarially Determined Insurance Assets and Liabilities (ADIAL). Under ADIAL, an insurance company's loss reserves are reasonable if they fall within the narrow range. No further inquiry is required. If the loss reserves fall outside the narrow range, the ADIAL process calls for further analysis to determine whether there is additional variability not reflected in the narrow range and for a second review by a different actuary in PwC's national office to determine whether a wider range of reasonable reserve estimates might be appropriate and, if so, whether the loss reserves fall within that wider range.

Mr. Kryczka determined that Acuity's carried loss reserves of $660,639,385 fell within his narrow range and concluded that the reserves were reasonable. He prepared and signed a statement of actuarial opinion opining that Acuity's carried loss reserves for 2006:

(a) Meet the requirements of the insurance laws of Wisconsin.

---

[40](...continued)
anticipated ultimate S & S.

[41] Mr. Kryczka defined a point estimate as a single number that comes out of his analysis.

**[*31]**   (b) Are computed in accordance with generally accepted actuarial standards and principles.

(c) Make a reasonable provision for all unpaid loss and loss adjustment expense obligations of the Company [Acuity] under the terms of its contracts and agreements.

On February 16, 2007, Mr. Kryczka provided the statement of actuarial opinion to Acuity. Acuity filed the statement of actuarial opinion and its Annual Statement for 2006 with the WOCI. In the Underwriting and Investment Exhibit of its Annual Statement for 2006, Acuity reported "Losses" of $507,746,203 and "Loss adjustment expenses" of $152,893,182,[42] the sum of which is Acuity's carried loss reserves of $660,639,385. Mr. Salzmann and two other officers of Acuity signed the Annual Statement for 2006 under penalty of perjury.

IX.   Audit of Acuity's Financial Statements

Acuity prepared its financial statements in accordance with SAP as required by State insurance regulators. In addition, Acuity prepared a separate set of financial statements in accordance with GAAP for internal management purposes and to maintain transparency. Acuity engaged PwC to audit both sets of financial statements for 2006. Thomas L. Brown (Tom Brown), then a partner at PwC, was

---

[42] The "Losses" and "Loss adjustment expenses" refer to unpaid losses and LAE on a net basis.

**[*32]** in charge of the audit, and Mr. Kryczka served as the actuarial specialist on the audit team.[43]

As relevant here, Tom Brown and his team evaluated Acuity's quality controls and tested the integrity of the claims that comprised Acuity's loss reserves, a material item on Acuity's balance sheet. The audit team examined a sampling of claims on a number of criteria, including accuracy of the dates and dollar amounts, validity under the terms of the insurance contracts, and completeness of the population as a whole (i.e., no missing claims or sequential gaps).[44] The audit team did not find anything that would render Acuity's financial statements unreasonable or potentially misleading, and so PwC issued Acuity an "unqualified opinion"[45] as to both the SAP and GAAP financial statements.

X. A.M. Best Company

The A.M. Best Company (Best) is a rating agency specializing in the insurance industry. Best evaluates the financial condition of insurance companies

---

[43] At the time of trial, Tom Brown was the chief financial officer of RLI Corp., an insurance company unaffiliated with Acuity.

[44] Some of the items examined by the audit team are part of Acuity's actual data entering into the actuarial methods. The audit team did not perform an actuarial analysis of Acuity's loss reserves.

[45] An "unqualified opinion" is an opinion that a company's financial statements are fairly represented in all material respects.

[*33] and rates them on the basis of the insurance company's financial solvency, ability to pay claims, and other factors. Best annually publishes Best's Insurance Reports--Property/Casualty, which are a compilation of Best's individual ratings on all property and casualty insurance companies it rates.

Best annually reviews Acuity. Gerard Altonji, a financial analyst and assistant vice president at Best, was the team leader for Acuity's 2006 review. Representatives from Best, including Mr. Altonji, met with Acuity's management, including Mr. Salzmann, with respect to the review. On March 7, 2007, Wendy Rae Schuler, Acuity's treasurer and vice president--finance, sent Best a letter (Best letter) containing financial information on Acuity. It was standard practice to send Best this type of letter. Among the many topics discussed in the Best letter was a paragraph on Acuity's loss reserves that stated:

> As of December 31, 2006, the actuarial net indicated reserves were $600.5 million with the carried reserves at $660.6 million. This represents a reserve margin of 10.0% of the indicated reserve or $60.1 million. ACUITY continues to adhere to the philosophy that an adequate reserve position is the bedrock of our business model. This is exhibited in our Claim Department's rigorous attention to case reserve adequacy and our heavy scrutiny of indicated IBNR levels. ACUITY maintains a reserve position consistent with the risks inherent in the exposure growth we have assumed from opportunities in the current market.

[*34]  Ms. Schuler, who is not an actuary, wrote this paragraph using information from Mr. Tures' workpapers.  She did not speak with Mr. Tures in writing the paragraph.  She intended to convey in the first two sentences the information shown on a sheet in Mr. Tures' workpapers entitled "12/31/06 Reserve Review" (Reserve Review sheet).

On the Reserve Review sheet, Mr. Tures shows a comparison in tabular form between Acuity's carried loss reserves and the loss reserves he computed under the optimistic scenario.  He used the column heading "Carried" to refer to Acuity's carried loss reserves, the column heading "Indicated"[46] to refer to the loss reserves he computed under the optimistic scenario, and the column headings "Strength" and "% Strength" to refer to the differences in absolute and percentage terms, respectively, between the "Carried" and "Indicated" reserves.

Ms. Schuler used the term "reserve margin" in the Best letter in place of the terms "Strength" and "% Strength" in referring to the difference between Acuity's carried loss reserves and the loss reserves under the optimistic scenario.  She copied the last three sentences of the paragraph almost word for word from a sheet

---

[46] The CAS Statement of Principles states that an indicated loss reserve is the result of the application of a particular loss reserving evaluation procedure.

**[*35]** entitled "12/31/2006 Reserve Analysis ACUITY Actuarial Results", which was part of a presentation to Acuity's board of directors.

As part of its review, Best calculates a Best Capital Adequacy Ratio (BCAR) score, which is a ratio of an insurance company's adjusted policyholder's surplus divided by the capital required to support its business risks. The BCAR score is computed using a risk-based model that assesses the risk of an insurance company's assets and liabilities, including loss reserves, for purposes of determining the capital required to support each of those risks. In computing Acuity's BCAR score for 2006, Best determined that Acuity's carried loss reserves of $660,639,385 might be deficient by 0.30%.[47] The BCAR analysis did not suggest, either explicitly or implicitly, that Acuity should change its carried loss reserves. Best provided the BCAR analysis to Acuity's management.

On April 18, 2007, Mr. Altonji and his team completed Best's report on Acuity for 2006. Best gave Acuity an "A+ (Superior)" rating for 2006. Best described Acuity's "Reserve Quality" as "maintains conservative reserving practices, as evidenced by consistently favorable loss reserve development on both a calendar year and accident year basis. Favorable development has been driven by

---

[47] Applying this percentage to Acuity's carried loss reserves of $660,639,385, Best calculated in the BCAR analysis that the carried loss reserves might be deficient by $1,980,000.

[*36] the workers' compensation line although most other major lines of business have developed favorably as well."

XI.      Loss Reserve Development

"Favorable development" and "unfavorable development" are terms used to describe downward and upward revisions to loss reserves, respectively. Insurance companies periodically revise their loss reserve estimates as new information on existing claims comes to light. The following table shows the development on Acuity's carried loss reserves for accident years before 2006 when measured as of yearend 2006:

| Annual statement date | Loss and ALAE reserves | Change in reserves | % Change |
|---|---|---|---|
| 12/31/1997 | [1]$208,485 | ($59,962) | (28.76) |
| 12/31/1998 | 198,935 | (40,483) | (20.35) |
| 12/31/1999 | 207,532 | (33,159) | (15.98) |
| 12/31/2000 | 222,274 | (17,354) | (7.81) |
| 12/31/2001 | 258,496 | (13,978) | (5.41) |
| 12/31/2002 | 302,427 | (4,933) | (1.63) |
| 12/31/2003 | 384,374 | (32,802) | (8.53) |
| 12/31/2004 | 487,263 | (58,887) | (12.09) |
| 12/31/2005 | 553,593 | (35,157) | (6.35) |

[1] All numbers are in thousands.

[*37] The following table shows the development on Acuity's carried loss reserves for accident year 2006 when measured as of yearend for 2007 through 2011:

| Development through | 2006 Loss and ALAE reserves | Cumulative change | % Change |
|---|---|---|---|
| 12/31/2007 | [1]$623,027 | ($25,729) | (4.13) |
| 12/31/2008 | 623,027 | (41,027) | (6.59) |
| 12/31/2009 | 623,027 | (47,855) | (7.68) |
| 12/31/2010 | 623,027 | (71,281) | (11.44) |
| 12/31/2011 | 623,027 | (79,919) | (12.83) |

[1] All amounts are in thousands.

XII.    Federal Income Taxes

On or about September 12, 2007, petitioner filed Form 1120-PC, U.S. Property and Casualty Insurance Company Income Tax Return, for 2006. On Schedule F, Losses Incurred--Section 832, petitioner reported discounted unpaid losses of $622,717,658.[48] That figure represents Acuity's carried loss reserves of $660,639,385 for 2006 discounted pursuant to section 846. On February 22, 2011, respondent mailed petitioner a notice of deficiency in which he determined, inter alia, that Acuity's carried loss reserves for 2006 were overstated by $96,129,294.

---

[48] Discounted unpaid losses are used in computing "losses incurred" within the meaning of sec. 832(b)(5).

**[\*38]** Respondent adjusted petitioner's taxable income upward by $96,129,294 and then made a corollary downward adjustment of $8,699,701 to reflect discounting under section 846. Petitioner timely petitioned the Court for redetermination.

OPINION

I.      Applicable Law

Acuity, as a nonlife insurance company, must compute its taxable income under section 832. See sec. 831. Under these statutory provisions, gross income includes amounts earned from investment and underwriting income, "computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Association of Insurance Commissioners". Sec. 832(b)(1)(A). Underwriting income is defined as "the premiums earned on insurance contracts during the taxable year less losses incurred and expenses incurred." Sec. 832(b)(3). "Losses incurred" means losses incurred during the taxable year on insurance contracts and includes increases for the year in "discounted unpaid losses (as defined in section 846)". Sec. 832(b)(5)(A).[49] As

---

[49] Sec. 832(b)(5)(A) provides:

In general.--The term "losses incurred" means losses incurred during the taxable year on insurance contracts computed as follows:

(continued...)

[*39] defined in section 846(b)(1), "unpaid losses" generally means "unpaid losses shown in the annual statement filed by the taxpayer for the year ending with or within the taxable year of the taxpayer." Unpaid losses include unpaid LAE. Sec. 832(b)(6).

Taxable income equals gross income, as described supra, less various deductions allowed pursuant to section 832(c). Sec. 832(a). One of the deductions allowed is for "losses incurred" as defined in section 832(b)(5).[50] Sec. 832(c)(4).

_____

[49](...continued)
  (i) To losses paid during the taxable year, deduct salvage and reinsurance recovered during the taxable year.

  (ii) To the result so obtained, add all unpaid losses on life insurance contracts plus all discounted unpaid losses (as defined in section 846) outstanding at the end of the taxable year and deduct all unpaid losses on life insurance contracts plus all discounted unpaid losses outstanding at the end of the preceding taxable year.

  (iii) To the results so obtained, add estimated salvage and reinsurance recoverable as of the end of the preceding taxable year and deduct estimated salvage and reinsurance recoverable as of the end of the taxable year.

  The amount of estimated salvage recoverable shall be determined on a discounted basis in accordance with procedures established by the Secretary.

[50] Although such a deduction would appear potentially duplicative of losses incurred that are taken into account in determining the underwriting income component of gross income under sec. 832(b)(3), the statute specifically prohibits the same item from being deducted more than once. See sec. 832(d).

**[*40]** The applicable regulations, which have remained substantively unchanged since their promulgation in 1944, require the taxpayer to establish that its estimate of unpaid losses is "fair and reasonable" and represents "only actual unpaid losses." Sec. 1.832-4(a)(14), (b), Income Tax Regs. (applicable regulations); see Md. Deposit Ins. Fund Corp. v. Commissioner, 88 T.C. 1050, 1059 (1987). The applicable regulations provide as follows:

> (14) In computing "losses incurred" the determination of unpaid losses at the close of each year must represent actual unpaid losses as nearly as it is possible to ascertain them.

> (b) Losses incurred. Every insurance company to which this section applies must be prepared to establish to the satisfaction of the district director that the part of the deduction for "losses incurred" which represents unpaid losses at the close of the taxable year comprises only actual unpaid losses. See section 846 for rules relating to the determination of discounted unpaid losses. These losses must be stated in amounts which, based upon the facts in each case and the company's experience with similar cases, represent a fair and reasonable estimate of the amount the company will be required to pay. Amounts included in, or added to, the estimates of unpaid losses which, in the opinion of the district director, are in excess of a fair and reasonable estimate will be disallowed as a deduction. The district director may require any insurance company to submit such detailed information with respect to its actual experience as is deemed necessary to establish the reasonableness of the deduction for "losses incurred."

The validity of the applicable regulations is well established, see, e.g., Hanover Ins. Co. v. Commissioner, 69 T.C. 260, 272 (1977), aff'd, 598 F.2d 1211 (1st Cir.

**[\*41]** 1979); <u>Hanover Ins. Co. v. Commissioner</u>, 65 T.C. 715, 719 (1976), and is not in dispute.

A reserve for unpaid losses is an estimate of the insurer's liability for claims that it will be required to pay in future years. <u>See</u> <u>W. Cas. & Sur. Co. v. Commissioner</u>, 65 T.C. 897, 917 (1976), <u>aff'd on another issue</u>, 571 F.2d 514 (10th Cir. 1978). Unpaid losses may not be based on estimates of potential losses that might be incurred in future years but instead must be based on the actual loss experience of the insurance company. <u>See</u> <u>Md. Deposit Ins. Fund Corp. v. Commissioner</u>, 88 T.C. at 1060; <u>Hosp. Corp. of Am. v. Commissioner</u>, T.C. Memo. 1997-482. The burden of proof is on the taxpayer to substantiate its claimed deduction.[51] <u>See</u> Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933); <u>Time Ins. Co. v. Commissioner</u>, 86 T.C. 298, 313-314 (1986).

---

[51] On August 27, 2012, petitioner filed a motion in limine to exclude two of respondent's exhibits and to shift the burden of proof to respondent. By order dated September 4, 2012, the Court took so much of petitioner's motion as moved to shift the burden of proof under advisement. In its opening brief, petitioner withdrew the part of its motion relating to the burden of proof. Accordingly, petitioner bears the burden of proof.

[*42] II.     The NAIC Annual Statement

A.     Seventh Circuit Law

The Court of Appeals for the Seventh Circuit, to which an appeal in this case would lie absent a stipulation to the contrary, see sec. 7482(b)(1)(A), (2), has stated that "State insurance commissioners' preferences about [loss] reserves * * * are not some intrusion on federal tax policy; using their annual statement is federal tax law." Sears, Roebuck & Co. v. Commissioner, 972 F.2d 858, 866 (7th Cir. 1992) (Sears, Roebuck & Co.), aff'g in part and rev'g in part 96 T.C. 61 (1991). In State Farm Mut. Auto. Ins. Co. v. Commissioner, 698 F.3d 357, 363 (7th Cir. 2012) (State Farm), aff'g in part, rev'g in part and remanding 135 T.C. 543 (2010), the Court of Appeals stated that

> [b]oth section 832(b)(1) and section 846 * * * refer to the NAIC-approved annual statement as the source of the unpaid losses used in calculating gross income. Underwriting income, which includes losses incurred, must be computed based on the annual statement. Any doubt about whether the unpaid losses (included in those losses incurred) are also to be computed according to the annual statement is resolved by the specific reference to that statement in section 846. We agree * * * that the NAIC-approved annual statement provides the rule for computing deductible loss reserves under section 832, at least where the NAIC has in fact provided a rule. [Emphasis added.]

**[\*43]**   B.   <u>The Parties' Arguments</u>

The parties dispute what role, if any, the Annual Statement plays in determining whether an insurance company's loss reserves are fair and reasonable. Respondent argues that the "relationship between the Annual Statement and section 832 does not prove that petitioner's Carried [Loss] Reserve is fair and reasonable." Respondent further argues that <u>State Farm</u> and <u>Sears, Roebuck & Co. </u> "hold that the annual statement controls for what is includible in the loss reserve but not the amount of the loss reserve itself."

Petitioner argues that respondent "simply fails to give due recognition to the expansive embrace of the Annual Statement in determining P&C loss reserves for tax purposes in <u>State Farm</u> * * * and * * * <u>Sears, Roebuck, and Co.</u>"  Petitioner further argues that "[n]o tax case supports an adjustment to a P&C insurance company's ordinary unpaid loss reserves determined by professional actuaries through accepted actuarial methodologies, and reported on the Annual Statement in accordance with NAIC statutory accounting guidance--which, of course, is exactly the situation presented in Acuity's case."

The law is well settled that the mere inclusion of an estimated figure on the Annual Statement, including a loss reserve estimate, does not conclusively establish its reasonableness for tax purposes.  <u>See</u> <u>Hanover Ins. Co. v.</u>

**[\*44]** <u>Commissioner</u>, 598 F.2d at 1217; <u>Pac. Employers Ins. Co. v. Commissioner</u>, 89 F.2d 186, 187 (9th Cir. 1937), <u>aff'g</u> 33 B.T.A. 501 (1935); <u>Hanover Ins. Co. v. Commissioner</u>, 65 T.C. at 719 ("[T]he cited cases which held the annual statement to be conclusive did not involve the reasonableness of the estimated figures appearing on such statement, but rather the format or methodology of such statement[.]").  The parties agree to that much.  The parties' disagreement, as we understand it, is whether the Annual Statement provides any guidance in computing the amount of a loss reserve estimate, and if so, how does that guidance factor into determining whether an amount so computed is fair and reasonable for tax purposes.

   C.   <u>SSAP No. 55</u>

   The relevant NAIC rule governing loss reserves is SSAP No. 55, which "establishes statutory accounting principles for recording liabilities for unpaid claims and claim adjustment expenses for * * * unpaid losses and loss adjustment expenses for property and casualty insurance contracts."  The NAIC recognized in SSAP No. 55 that "no single claim or loss and loss/claim adjustment expense reserve can be considered accurate with certainty."  We similarly recognized in <u>Physicians Ins. Co. of Wis., Inc. v. Commissioner</u>, T.C. Memo. 2001-304 (<u>Physicians Ins.</u>), slip op. at 24, that there is no single "correct" loss reserve

**[*45]** estimate, except possibly in hindsight. SSAP No. 55 instead provides that "management [of an insurance company] shall record its best estimate of its liabilities for unpaid claims, unpaid losses, and loss/claim adjustment expenses." This requirement is in accord with <u>Bituminous Cas. Corp. v. Commissioner</u>, 57 T.C. 58, 78 (1971), wherein we stated that when the Annual Statement methodology is predicated upon the use of estimates, those estimates must be the "best possible."

SSAP No. 55 provides some general principles and considerations in computing the amount of a loss reserve estimate:

> The liability for claim reserves and claim liabilities, unpaid losses, and loss/claim adjustment expenses shall be based upon the estimated ultimate cost of settling the claims (including the effects of inflation and other societal and economic factors), <u>using past experience adjusted for current trends, and any other factors that would modify past experience.</u>  * * *

> Various analytical techniques can be used to estimate the liability for IBNR claims, future development on reported losses/claims, and loss/claim adjustment expenses. These techniques generally consist of statistical analysis of historical experience and are commonly referred to as loss reserve projections. The estimation process is generally performed by line of business, grouping contracts with like characteristics and policy provisions. The decision to use a particular projection method and the results obtained from that method shall be evaluated by considering the inherent assumptions underlying the method and the appropriateness of those assumptions to the circumstances. No single projection method is inherently better than any other in all

[*46]   circumstances.  The results of more than one method should
be considered.
[Emphasis added.]

SSAP No. 55 reflects the NAIC's recognition that past experience needs to be adjusted for current trends and other factors.  SSAP No. 55 further reflects the NAIC's understanding that each actuarial method has its own set of assumptions and a single actuarial method is not appropriate in all cases.  These principles are consistent with the applicable regulations, which provide that unpaid "losses must be stated in amounts which, based upon the facts in each case and the company's experience with similar cases, represent a fair and reasonable estimate."  (Emphasis added.)  They are also consistent with our caselaw, which provides that a fair and reasonable estimate of a taxpayer's unpaid losses is essentially a valuation issue and a question of fact.  See Hanover Ins. Co. v. Commissioner, 69 T.C. at 270; Physicians Ins., slip op. at 23; Minn. Lawyers Mut. Ins. Co. v. Commissioner, T.C. Memo. 2000-203 (Minn. Lawyers), slip op. at 24, aff'd, 285 F.3d 1086 (8th Cir. 2002); Utah Med. Ins. Ass'n v. Commissioner, T.C. Memo. 1998-458 (Utah Med.), slip op. at 21.

D.   The ASOPs, Appointed Actuaries, and Actuarial Opinions

The NAIC rules also require an insurance company to file a statement of actuarial opinion, prepared and signed by its appointed actuary, with the Annual

[*47] Statement. The statement of actuarial opinion sets forth, among other things, the appointed actuary's opinion as to the reasonableness of the insurance company's loss reserves. The appointed actuary is required to follow the ASOPs.

The ASOPs provide objective principles and considerations in computing loss reserve estimates and ranges, among other things. Thus, the ASOPs provide a basis for a taxpayer to "objectively validate that the methods and assumptions it relied upon to make its estimate are reasonable." Physicians Ins., slip op. at 24. ASOP 36, in particular, provides guidance to an appointed actuary in issuing a statement of actuarial opinion. ASOP 36, sec. 3.2.1, provides that the appointed actuary should consider the CAS Statement of Principles.

Relying on Minn. Lawyers, respondent argues that "[p]etitioner's attempted reliance on [Acuity's appointed actuary at] PwC is unwarranted because PwC did not review or opine on whether * * * [Acuity's] Carried Reserve met the standards for a federal income tax deduction for unpaid losses." Respondent further argues that "[p]etitioner's effort to conflate state regulatory requirements with federal tax requirements is without merit." Respondent's argument misses the mark.

In Minn. Lawyers, the taxpayer's management added an "adverse development reserve" onto the case reserves established by the taxpayer's claims department. Minn. Lawyers, slip op. at 9-13. We found that the taxpayer failed to

[*48] prove the necessity of the adverse development reserve. Id. at 34. The taxpayer's appointed actuary at Milliman & Robertson, Inc. (Milliman), and KPMG Peat Marwick (KPMG) issued a statement of actuarial opinion for the first year in issue and the second and third years in issue, respectively, certifying to the State regulator that the taxpayer's loss reserves made a reasonable provision for the taxpayer's unpaid losses and LAE. Id. at 38. However, the record did not establish that such a certification was equivalent to the requirement in the applicable regulations that loss reserves must be fair and reasonable. Id.

We placed little weight on the appointed actuaries' certifications that the taxpayer's loss reserves were reasonable because the actuarial reports prepared by those same actuaries indicated the contrary. The taxpayer's appointed actuary at Milliman did not compute a range of reasonable reserve estimates. Id. at 36. The actuary instead computed a "best estimate" that was significantly lower than the taxpayer's loss reserves, and the taxpayer did not provide any explanation for the difference. Id. The taxpayer's appointed actuary at KPMG likewise computed a "selected point estimate" that was significantly lower than the taxpayer's loss reserves. Id. at 37. Although the actuary computed a range of reasonable reserve estimates that encompassed the taxpayer's loss reserves, the range was so large that

**[\*49]** we could not determine whether every point in the range was fair and reasonable.  Id. at 37-38.

We found that the taxpayer failed to prove that its loss reserves were fair and reasonable.  Id., at 42-43.  We concluded that the point estimate of the Commissioner's actuarial expert, which exceeded the point estimate of the taxpayer's appointed actuary at Milliman, was the best estimate of the taxpayer's loss reserves for the first year in issue, and the point estimates of the taxpayer's appointed actuary at KPMG were the best estimates for the second and third years in issue.  Id. at 43-45.

In the instant case, Mr. Kryczka, Acuity's appointed actuary at PwC, issued a statement of actuarial opinion certifying to the WOCI that Acuity's carried loss reserves are reasonable.  Petitioner does not argue that Mr. Kryczka's certification is tantamount to a sanctification of Acuity's carried loss reserves as fair and reasonable for tax purposes.  Rather, petitioner argues that "Mr. Kryczka performed his work and provided his opinion in conformity with professional actuarial and statutory accounting standards, and opined that Acuity's carried reserve was reasonable under those standards.  These are the standards that this Court has looked to in prior loss reserve cases."  We agree.

**[*50]**    As we determined in <u>Minn. Lawyers</u>, the mere certification by an appointed actuary that an insurance company's loss reserves are reasonable is of little probative value for tax purposes.  However, contrary to respondent's argument, such is not the case with respect to the actuarial computations of the appointed actuary underlying that certification.  In <u>Minn. Lawyers</u>, while we rejected the certifications of the taxpayer's appointed actuary at KPMG, we accepted the point estimates actuarially computed by the KPMG actuary as the best estimates of the taxpayer's loss reserves for the second and third years in issue.

In <u>Physicians Ins.</u>, the taxpayer retained the firm Tillinghast-Towers Perrin (Tillinghast) to compute its loss reserves.  <u>Physicians Ins.</u>, slip op. at 6.  The taxpayer's actuary at Tillinghast served as its appointed actuary.  <u>Id.</u> at 31.  We found that the taxpayer's loss reserves were unreasonable because the taxpayer's management added a margin of approximately 10% onto the point estimates actuarially computed by the Tillinghast actuary.  <u>Id.</u> at 36.  However, as was the case in <u>Minn. Lawyers</u> for the second and third years in issue, we accepted the Tillinghast actuary's point estimates as the best estimates of the taxpayer's loss reserves for the two years in issue.  <u>Id.</u> at 40.

In <u>Utah Med.</u>, the taxpayer also retained the firm of Tillinghast to compute its loss reserves.  <u>Utah Med.</u>, slip op. at 9-12.  The taxpayer's actuary at Tillinghast

[*51] also served as its appointed actuary. Id. at 5. However, unlike the taxpayer in Physicians Ins., the taxpayer in Utah Med selected its loss reserves each year from within a range of reasonable reserve estimates actuarially computed by the Tillinghast actuary. Id. at 12, 22, 27-28. We found that the Tillinghast actuary complied with all relevant actuarial standards (i.e., the ASOPs). Id. at 24. We concluded that the taxpayer's loss reserves were fair and reasonable for the years in issue. Id. at 35.

In sum, the statement of actuarial opinion is an integral part of the Annual Statement. The NAIC rules require an insurance company to file a statement of actuarial opinion prepared and signed by its appointed actuary. The appointed actuary is required to follow the ASOPs. And the ASOPs, in particular ASOP 36, provide objectively reasonable guidance to the appointed actuary in computing loss reserve estimates and ranges for the purpose of opining on the reasonableness of the insurance company's loss reserves. Consequently, we find that an appointed actuary's actuarial analysis and determination is highly probative for tax purposes. Respondent's assertion that petitioner cannot rely on Acuity's appointed actuary at PwC is unfounded and contrary to our caselaw.

**[\*52]** E.   Annual Statement Conclusion

"Section 832 is no ordinary rule.  It expressly links federal taxes to the NAIC's annual statement".  Sears, Roebuck & Co., 972 F.2d at 865-866.  And the "NAIC-approved annual statement provides the rule for computing deductible loss reserves under section 832, at least where the NAIC has in fact provided a rule." State Farm, 698 F.3d at 363.  As discussed supra, the NAIC rules do not provide a mechanical formula, nor does one exist, to calculate the precise amount of loss reserves required for each insurance company.

Instead, the NAIC rules provide principles and considerations for computing an estimate of an insurance company's loss reserves.  These principles and considerations are objectively reasonable and consistent with the applicable regulations and our caselaw.  The ASOPs further provide objectively reasonable guidance to actuaries for computing loss reserve estimates and ranges.  In addition, the NAIC rules require an insurance company's appointed actuary to evaluate the reasonableness of the insurance company's loss reserves in a statement of actuarial opinion.  The ASOPs, in particular ASOP 36, provide objectively reasonable guidance to the appointed actuary in this task.

Accordingly, in the factual determination whether an insurance company's loss reserves are fair and reasonable and represent only actual unpaid losses, we

[*53] assign substantial weight to evidence that the loss reserves (1) were actuarially computed in accordance with the NAIC rules and ASOPs and (2) fell within a range of reasonable reserve estimates as determined by the insurance company's appointed actuary in accordance with the ASOPs.[52]

III.     Mr. Tures' Actuarial Analysis

        A.     Qualified Actuary

Mr. Tures, FCAS, MAAA, a qualified and credentialed actuary, computed Acuity's loss reserves for 2006.  He had at the time almost 20 years of actuarial experience, including several years as Acuity's vice president--actuarial and strategic information.  He was intimately familiar with Acuity's business and had complete access to Acuity's claims, underwriting, marketing, and sales data.

---

[52] As described supra p. 27, ASOP 36, sec. 3.3.2(a), provides that "[w]hen the stated reserve amount is within the actuary's range of reasonable reserve estimates (see section 3.6.4), the actuary should issue a statement of actuarial opinion that the stated reserve amount makes a reasonable provision for the liabilities associated with the specified reserves."  The revised edition of ASOP 36 renumbered this section and changed some of the terminology, but the concept remains largely the same.  The revised edition of ASOP 36, sec. 3.7, provides that an "actuary should consider a reserve to be reasonable if it is within a range of estimates that could be produced by an unpaid claim estimate analysis that is, in the actuary's professional judgment, consistent with both ASOP No. 43, Property/Casualty Unpaid Claim Estimates, and the identified stated basis of reserve presentation."

[*54]  B.  Selection of Inputs

Mr. Tures began his reserve analysis with actual data based on past experience.  Where appropriate, he used Acuity's historical data.  In States where Acuity lacked sufficient historical data, he consulted industry data.  Following SSAP No. 55, the CAS Statement of Principles, and the ASOPs, he examined and adjusted the data to account for Acuity's changing mix of business, rapid growth rate, evolving claims patterns, increasing litigation costs, and other factors.  Using his best professional judgment, he then selected appropriate and reasonable inputs into his actuarial methods.

Respondent argues that Mr. Tures was biased in his selection of inputs, relying upon high assumptions that are not supported by Acuity's past experience.  Respondent attacks Mr. Tures' judgment in selecting paid loss development factors for accident year 2006 in the workers compensation analysis that were "the average of the last five years rather than the more recent three years in which the trend was going down for [development at] 12-24 and 24-36 months."  Respondent similarly attacks Mr. Tures' judgment in selecting incurred loss development factors that were "higher than Acuity's actual Loss Development."  Respondent shows in his

[*55] brief the following table of incurred loss development factors selectively quoted[53] from Mr. Tures' workpapers:

| Accident year | Development at 12-24 months | Development at 24-36 months |
|---|---|---|
| 2003 | 1.016 | .997 |
| 2004 | 1.022 | .987 |
| 2005 | 1.045 | .996 |
| Selected [for 2006] | 1.078 | 1.020 |

Respondent omits from his table earlier accident years, which were shown on the same page of Mr. Tures' workpapers and considered in his analysis. For example, the incurred loss development factor of 1.078 that Mr. Tures selected for development at 12-24 months for accident year 2006 is lower than Acuity's incurred loss development factors of 1.121 for accident year 2001 and 1.187 for accident year 2002. Furthermore, the incurred loss development factor of 1.078 is the five-year average (2001-05). Respondent has not cited a single SSAP, ASOP, or other objective source, nor have we found any, supporting his argument that a three-year average loss development factor is reasonable whereas a five-year average loss development factor is somehow unreasonable.

_____

[53] Respondent misquotes Mr. Tures' workpapers in that the incurred loss development figures for development at 24-36 months respondent shows in his brief relate to accident years 2002-04 and not 2003-05.

**[*56]**    Respondent attacks several other figures in Mr. Tures' workpapers as being "inappropriately excessive", "inconsistent with * * * [Acuity's] actual experience", and a product of "Mr. Tures' poor 'judgment.'"  We are unpersuaded by respondent's criticisms of Mr. Tures' actuarial selections.

SSAP No. 55 states that loss reserves shall be computed "using past experience adjusted for current trends, and any other factors that would modify past experience."  The underlying premise is that past experience can be used to predict future experience.  However, implicit in this premise is the recognition that past experience should not be viewed in a vacuum.  Changing conditions both inside and outside an insurance company can cause future experience to diverge from past experience.  Past experience must thus be appropriately adjusted to reflect these changing conditions.  This is where actuarial judgment comes into play.  As the CAS Statement of Principles appropriately states:  "Understanding the trends and changes affecting the data base is a prerequisite to the application of actuarially sound reserving methods."

Mr. Tures credibly testified as to the process by which he used Acuity's historical data and industry data, adjusted the data to reflect changing conditions within and without Acuity, and selected inputs using his sound actuarial judgment.

**[*57]** Mr. Tures' workpapers, consisting of approximately 900 pages of actuarial analysis, corroborate his testimony.

We find that Mr. Tures made a reasonable selection of inputs in accordance with his best professional judgment and the principles and considerations embodied in SSAP No. 55, the CAS Statement of Principles, and the ASOPs. We decline to substitute respondent's judgment for Mr. Tures' professional judgment. See, e.g., Physicians Ins., slip op. at 37 (declining to second-guess the professional judgment of the taxpayer's actuary).

C. Actuarial Methods and Outputs

Mr. Tures used eight actuarially recognized methods to compute Acuity's estimated ultimate losses and three additional methods to compute estimated ultimate ALAE and anticipated ultimate S & S. He performed computations under the eight methods and then used his best professional judgment in selecting among the outputs of the methods. Respondent argues that "[t]he Paid Loss Development Method and the Paid using 5-year Weighted Average Method have the least amount of assumptions to be made by the actuary, but Mr. Tures never selected either of these methods."[54] Respondent seems to imply that those two methods

---

[54] From respondent's brief, it appears that respondent is referring specifically to Acuity's workers compensation line of insurance. Mr. Tures did

(continued...)

**[*58]** would have been more appropriate to rely upon because they require fewer assumptions. However, his argument is contradicted by the express language of SSAP No. 55, which provides that "[n]o single projection method is inherently better than any other in all circumstances."

SSAP No. 55 provides that an actuary should consider the inherent assumptions underlying each method and the appropriateness of those assumptions under the circumstances in deciding which methods to rely upon. Mr. Tures did just that. He performed computations under the Brosius method but in his best professional judgment decided not to rely upon them. For the more recent accident years, where the data is immature, he placed greater reliance upon the BF methods. Other times he selected a simple average, a weighted average, or the output of a particular method. We find that his choice of methods and selection of outputs were reasonable and consistent with SSAP No. 55, the CAS Statement of Principles, and the ASOPs.

---

[54](...continued)
incorporate the Paid Loss Development Method and the Paid using 5-year Weighted Average Method into his selections in other lines. As an example, for Acuity's commercial auto liability line, Mr. Tures took the simple average of the outputs of all eight methods for accident years 1999, 2000, and 2001.

**[\*59]**   D.   <u>No Margin Added</u>

Mr. Tures arrived at expected loss reserves of $660,639,385 on a net basis for 2006.  He credibly testified that his expected loss reserves were his best estimate of the amount Acuity would ultimately be expected to pay for all losses, including LAE, over the amount it had already paid as of yearend 2006.  He further credibly testified that Acuity's management adopted his expected loss reserves without change.  Mr. Salzmann likewise credibly testified that Acuity's management did not make any adjustments to Mr. Tures' expected loss reserves.

Likening this case to <u>Physicians Ins.</u> and <u>Minn. Lawyers</u>, respondent argues that Acuity added a margin onto Mr. Tures' actuarially computed loss reserves.[55] Respondent argues that Mr. Tures computed indicated loss reserves of $600,581,261 and then "deliberately increased his indicated reserve by $60,000,000."  Respondent further argues that "[b]ecause the Court has been clear about the non-deductibility of margins, * * * [Acuity] attempted to make it appear as though its $60 million self-described margin was actuarially determined."  Respondent asserts that Acuity "tried to hide its $60 million margin" by having Mr.

---

[55] Respondent interchangeably uses the terms "margin", "add-on", and "mark-up" in his brief.

**[*60]** Tures revise "the actuarial assumptions within * * * [his] workpapers to support * * * [Acuity's] target of a Carried Reserve with a 10% margin."

### 1. Reserve Review Sheet

Respondent points to the Reserve Review sheet in support of his argument. The Reserve Review sheet contains a table with the column headings "Carried", "Indicated", "Strength", and "% Strength". Underneath the column heading "Carried" are amounts for the components comprising Acuity's carried loss reserves (i.e., ALAE IBNR, ULAE IBNR, case reserves, etc). The sum of the amounts is Acuity's carried loss reserves of $660,639,385.[56] Underneath the column heading "Indicated" are amounts for the same components adding up to $600,581,261, which Mr. Tures testified to be the amount of the loss reserves he computed under the optimistic scenario. We find Mr. Tures to be a very credible witness. See Diaz v. Commissioner, 58 T.C. 560, 564 (1972) (stating that the process of distilling truth from the testimony of witnesses, whose demeanor we observe and whose credibility we evaluate, is the daily grist of judicial life). The "Strength" and "% Strength" columns show the differences between the "Carried" and "Indicated" columns.

_____

[56] The amounts add up to $660,639,387, a difference of $2 from Acuity's carried loss reserves. We treat this difference as de minimis and immaterial (it may be due to rounding). See supra note 29.

**[*61]**    Respondent attaches great significance to Mr. Tures' use of the term

"Indicated", arguing that "[t]he use of the term 'indicated' throughout * * *

[Acuity's] own documents and its use by other actuaries confirms that * * *

[Acuity] added a 10% margin to its actuarially indicated Carried Reserve."

Respondent further argues that "[i]f 'indicated' were defined as 'optimistic,' Mr.

Tures' workpapers or analysis would be nonsensical."  We disagree.

The CAS Statement of Principles states that "[a]n indicated loss reserve is

the result of the application of a particular loss reserving evaluation procedure."

That definition is consistent with Mr. Tures' use of the term in his workpapers.  On

the Reserve Review sheet, we find that he used the term "Indicated" to refer to the

result he computed under the optimistic scenario.  He used the term "Indicated" on

the sheet directly preceding the Reserve Review sheet to refer to his expected loss

reserves, i.e., the result he computed using his best estimates.   On a sheet entitled

"Reserve Ranges 12/31/2006" in which Mr. Tures compared in tabular form his

expected loss reserves with the lower and upper bounds of his loss reserve range,

he used the term "Indicated Reserves - Direct" to refer to the amounts he computed

on a direct basis, the term "Indicated Ceded Reserves" to refer to the amounts of

**[*62]** reinsurance, and the term "Indicated Reserves - Net" to refer to the amounts he computed on a net basis.[57]

Respondent has failed to persuade us that Mr. Tures' use of the term "Indicated" on the Reserve Review sheet, or elsewhere, supports his argument that Mr. Tures computed an actuarially indicated loss reserve of $600,581,261 and subsequently hid a 10% margin within his actuarial computations.

2.    Best Letter

In a similar vein, respondent points to the Best letter in support of his argument, relying heavily upon two sentences in which Ms. Schuler stated:  "As of December 31, 2006, the actuarial net indicated reserves were $600.5 million with the carried reserves at $660.6 million.  This represents a reserve margin of 10.0% of the indicated reserve or $60.1 million."  Respondent also relies upon Mr. Altonji's testimony that he understood the two sentences to mean that Acuity "believes that they have a comfortable cushion in the loss reserves."  Respondent argues that "Ms. Schuler understood that her use of the term 'margin' meant 'margin' and that her use of the term 'actuarial indicated' meant actuarially determined."

---

[57] "Indicated Reserves - Net" is the difference between the "Indicated Reserves - Direct" and the "Indicated Ceded Reserves".

**[*63]**     However, Ms. Schuler is not an actuary.  As described <u>supra</u> pp. 33-35, she wrote the paragraph on Acuity's loss reserves in the Best letter using information from Mr. Tures' workpapers.  She did not speak with Mr. Tures in writing the paragraph.  The information for the two sentences in question came from the Reserve Review sheet, but Ms. Schuler inadvertently took that information out of context.

On the Reserve Review sheet, Mr. Tures compared Acuity's carried loss reserves with the loss reserves he computed under the optimistic scenario.  Mr. Tures used the terms "Strength" and "% Strength" to refer to the differences in absolute and percentage terms, respectively, between Acuity's carried loss reserves and the loss reserves under the optimistic scenario.  Ms. Schuler used the term "reserve margin" in place of "Strength" and "% Strength".  She credibly testified that she understood the word margin to mean "difference" as in the "difference between the indicated or optimistic scenario and the carried."[58]  She further credibly testified that Acuity's carried loss reserves are Mr. Tures' best estimate and do not contain any cushion.

---

[58]  We note that her understanding is consistent with Merriam Webster's Collegiate Dictionary 711 (10th ed. 1996), which defines "margin" as, inter alia, "measure or degree of difference".

**[\*64]**  Mr. Altonji's understanding of the two sentences in question, while relevant, is certainly not determinative, and it is contradicted by the credible testimony of Mr. Tures, Mr. Salzmann, and Ms. Schuler.  We are simply unpersuaded that Ms. Schuler's inartful wording of two sentences in the Best letter establishes that Acuity added a hidden 10% margin to its loss reserves.

### 3.  Mathematical Computations

Respondent argues that "Mr. Tures did not estimate a reserve of $660,639,387 and, then, subtract 9.09090907714831722559970865993795% ($60,058,126 / $660,639,387) from that to determine an 'optimistic' estimate. He estimated a reserve of $600,581,261 and added a 10% 'strength' or 'margin' to it."  However, the bare fact that Mr. Tures' expected loss reserves are 10% higher than the loss reserves he computed under the optimistic scenario does not establish that one was used to compute the other.[59]  Mr. Tures credibly testified that he computed the loss reserves under the optimistic scenario independently of his expected loss reserves using the same methodologies but varying his assumptions and inputs, and we so find.

---

[59]  We note that dividing Mr. Tures' expected loss reserves by 1.1 would also result in the loss reserves under the optimistic scenario.

**[*65]**     4.     Conclusion on Margin

Substantial credible evidence in the record supports petitioner's position that Acuity's carried loss reserves contain no margin. Mr. Tures credibly testified that his expected loss reserves were his best estimate of Acuity's unpaid losses and LAE. He further credibly testified that he did not add a margin onto a lower estimate to arrive at his expected loss reserves. His workpapers corroborate his testimony and show in great detail the computation of his expected loss reserves. Both of respondent's actuarial experts reviewed Mr. Tures' workpapers, and neither of them noted the existence of a hidden margin.[60] Mr. Salzmann and Ms. Schuler both credibly testified that Acuity adopted Mr. Tures' expected loss reserves without change. On the basis of the foregoing, we find that Acuity's carried loss reserves are Mr. Tures' actuarially computed best estimate with no implicit or explicit margin.

    E.     Prior Loss Reserve Development

Respondent cites Acuity's history of favorable development for accident years before 2006 as evidence that Acuity's carried loss reserves for 2006 are not fair and reasonable. Respondent argues that Acuity had an average redundancy of

---

[60] Brian Brown, one of petitioner's actuarial experts, also reviewed Mr. Tures' workpapers, and he too did not observe any kind of hidden margin.

**[*66]** over 11% from 1997 through 2005.  Respondent further argues that Acuity had actual knowledge of its "over-reserving" practice but failed to explain how Mr. Tures adjusted his methods or assumptions to incorporate Acuity's "over-reserving" experience.  Petitioner argues that there has been substantial variability in Acuity's loss reserves and that five of the six years preceding 2006 show favorable development of under 10%.  Petitioner further argues that Mr. Tures took this prior experience into account in his loss reserve analysis for 2006.  We agree with petitioner.

The fact that a taxpayer's loss reserve estimate proves, with hindsight, to be higher than actual payments does not establish that the taxpayer's estimate was unreasonable.  See Utah Med., slip op. at 29.  A taxpayer's loss reserve estimate must be fair and reasonable, but is not required to be accurate based on hindsight.  Id.; Physicians Ins., slip op. at 39.  In Utah Med., we approved of the "lookback method", whereby the taxpayer's actuary reestimated ultimate loss estimates for prior coverage years in computing the ultimate loss estimates for the years at issue.  See Utah Med., slip op. at 31.  Similarly, in Physicians Ins. we approved of the fact the taxpayer's actuary took into account developing redundancies in establishing loss reserve estimates.  See Physicians Ins., slip op. at 39.

**[\*67]**   We find that Mr. Tures took Acuity's prior development into account in his

actuarial analysis.  He credibly testified that this occurs as "the actual losses

replace the expected losses on [each loss development] triangle."  He further

credibly testified that he used the "latest data available" in his analysis.

Respondent asserts that

> Mr. Tures took into account the redundancies in prior years only as
> data inputs into the Loss triangles in later years.  This new data did
> not 'supplant' or replace the old data; the new data added another
> 'diagonal' to the Loss Triangles, that is, the old data remained under
> the correct accident year, with an increase to its age (maturity) and
> the new data provided another year's worth of information.

We find this distinction to be immaterial.  Whether the latest data supplemented or

supplanted prior data, the record establishes that Mr. Tures incorporated Acuity's

development into his actuarial analysis.  Further evidencing the reasonableness of

his analysis, Acuity's favorable development decreased from an average of

approximately 21.7% for 1997-99 to approximately 7.2% for 2002-05.[61]  See supra

p. 36.

   F.   Conclusion on Mr. Tures' Actuarial Analysis

   Mr. Tures performed his actuarial analysis in accordance with the NAIC

rules, the CAS Statement of Principles, and the ASOPs.  He used his best

---

   [61]  The years before the year at issue in which Mr. Tures was Acuity's vice
president–actuarial and strategic information are 2002-05.

**[\*68]** professional judgment in selecting appropriate and reasonable inputs to and outputs from his actuarial methods. He computed expected loss reserves of $660,639,385 for 2006. Acuity's management adopted that amount without change. Respondent's attacks on Mr. Tures' actuarial analysis are all unconvincing. We find the foregoing to be substantial evidence that Acuity's carried loss reserves for 2006 are fair and reasonable. See supra pp. 52-53.

IV.    Mr. Kryczka's Actuarial Analysis and Determination

The NAIC rules require an insurance company to file a statement of actuarial opinion, prepared and signed by a qualified actuary, with the Annual Statement. Mr. Tures was perfectly qualified to issue and capable of issuing the statement of actuarial opinion. However, Mr. Salzmann wanted to create an additional level of review. He wanted an outside consulting actuary to independently review Acuity's loss reserves and issue the statement of actuarial opinion. This was part of his "systematic checks and balances". Consequently, Acuity's board of directors selected John R. Kryczka, FCAS, FCIA, MAAA, to be Acuity's appointed actuary for 2006.

A.    Qualified Actuary

Like Mr. Tures, Mr. Kryczka was and is a qualified and credentialed actuary. He had more than 20 years of actuarial experience at the time he issued

**[\*69]** his statement of actuarial opinion. He too familiarized himself with the latest changes to Acuity's business before performing his actuarial analysis. He credibly testified that he and his team met with Acuity's management, including Mr. Salzmann, "to understand what's going on with [the] company's book of business, * * * we need to understand what is going on with the company in order to make the proper actuarial judgments in our reports so we can try to project what's going to happen in the future."

## B. Determination of Reasonable Provision

Mr. Kryczka performed his actuarial analysis in accordance with the ASOPs, in particular ASOP 36 governing statements of actuarial opinion. He used his best professional judgment and took into account the latest changes to Acuity's business in selecting appropriate and reasonable inputs to and outputs from his actuarial methods. He computed a narrow range of reasonable reserve estimates from $577,108,000 to $661,329,000 around a point estimate of $607,482,000. He determined that Acuity's carried loss reserves of $660,639,385 fell within his narrow range and issued a statement of actuarial opinion opining that Acuity's carried loss reserves for 2006:

(a) Meet the requirements of the insurance laws of Wisconsin.

**[\*70]**   (b) Are computed in accordance with generally accepted actuarial standards and principles.

(c) Make a reasonable provision for all unpaid loss and loss adjustment expense obligations of the Company [Acuity] under the terms of its contracts and agreements.

C.    No Range "Stretching"

Respondent's principal argument is that Mr. Kryczka "stretched" his range to ensure that it encompassed Acuity's carried loss reserves.[62]   Respondent argues that "[t]his is merely accommodating petitioner, not checking or balancing the Carried Reserve."   We find that respondent's argument is contrary to the evidence in the record.

ASOP 36, sec. 3.3, provides that an appointed actuary should document the scope and intended use of a statement of actuarial opinion.  Mr. Kryczka was appointed by Acuity's board of directors to perform an independent review of Acuity's carried loss reserves for the purpose of determining whether the reserves were reasonable.  In the first paragraph of his statement of actuarial opinion, Mr.

---

[62]   Respondent also argues on brief that Mr. Kryczka "stretched" or "extended" his point estimate to ensure that he could create a range that encompassed Acuity's carried loss reserves.  Respondent does not explain how a number (as opposed to a range) can be "stretched" or "extended".  We understand his argument to be that Mr. Kryczka computed an unreasonably high point estimate by using assumptions and selections in his actuarial analysis that were biased high.  We reject this argument.  See infra pp. 77-78.

**[\*71]** Kryczka wrote that "my responsibility is to express an opinion on loss and loss adjustment expense reserves based on my review."

As explained <u>supra</u> pp. 27-28, under ASOP 36, 3.3.2, Mr. Kryczka could express one of five types of opinions: (1) determination of reasonable provision; (2) determination of deficient or inadequate provision; (3) determination of redundant or excessive provision; (4) qualified opinion; or (5) no opinion. He did not "accommodate petitioner" and rubber stamp Acuity's carried loss reserves. To the contrary, he performed an independent actuarial analysis consisting of approximately 900 pages pursuant to ASOP 36, sec. 3.5, and computed a range of reasonable reserve estimates for the purpose of determining whether Acuity's carried loss reserves fell within that range.

ASOP 36, sec. 3.6.4, supports Mr. Kryczka's approach. It states that an "actuary may determine a range of reasonable reserve estimates that reflects the uncertainties associated with analyzing the reserves. A <u>range of reasonable estimates</u> is a range of estimates that could be produced by appropriate actuarial methods or alternative sets of assumptions that the actuary judges to be reasonable." Mr. Kryczka credibly testified that if Acuity's carried loss reserves fell outside of his range of reasonable reserve estimates, he would not have issued a determination of reasonable provision opinion under ASOP 36, sec. 3.3.2(a).

**[*72]**    Mr. Kryczka used a PwC process known as ADIAL to compute his range of reasonable reserve estimates.  He computed separate ranges for each of Acuity's lines of insurance and then applied a weighted average to the individual ranges to compute an overall range.  He described the range he computed as a "narrow range" or a "stage one range".

Mr. Kryczka credibly testified that if an insurance company's loss reserves fall within an actuary's narrow range of reasonable reserve estimates computed under ADIAL, the actuary's inquiry ends and the actuary issues an opinion opining that the loss reserves are reasonable.  He further credibly testified that if an insurance company's loss reserves fall outside of the actuary's narrow range, the actuary would have discussions with the insurance company to try and understand whether there was some additional variability that was not reflected in the actuary's analysis, and if so, the actuary might revise the narrow range.  If the actuary determined that a revision was not warranted, PwC's internal process calls for a second review by a different actuary in PwC's national office to determine whether a wider range of reasonable reserve estimates would be justified.  Mr. Kryczka described this wider range as a "stage two range".

Acuity's carried loss reserves of $660,639,385 fell within Mr. Kryczka's narrow range of reasonable reserve estimates from $577,108,000 to

[*73] $661,329,000.[63]  Consequently, his inquiry ended and he issued a statement of actuarial opinion opining that Acuity's carried loss reserves make a reasonable provision for Acuity's unpaid losses and LAE.

D.  Appropriate and Reasonable Range

Respondent argues that Mr. Kryczka's range was "so large that petitioner cannot show that every point within * * * [the] range represents actual unpaid losses as nearly as it is possible to ascertain them."  Respondent further argues that "[n]ot only can a range not be entered on a Federal income tax return or NAIC annual statement, but the range itself is so wide as to be meaningless."

We reject the implication in respondent's argument that Mr. Kryczka's decision to compute a range may have been inappropriate.  ASOP 36, sec. 3.6.4, specifically authorizes the computation of a range of reasonable reserve estimates. Likewise, the CAS Statement of Principles states that "[t]he uncertainty inherent in the estimation of required provisions for unpaid losses or loss adjustment expenses implies that a range of reserves can be actuarially sound."  Mr. Kryczka computed a

---

[63]  In Utah Med. Ins. Ass'n v. Commissioner, T.C. Memo. 1998-458, slip op. at 12, the taxpayer selected a loss reserve estimate at the high end of a range of reasonable reserve estimates computed by the taxpayer's actuary for each of the years at issue.  We rejected respondent's argument that the midpoint of an actuarially sound range is the only fair and reasonable estimate.  See id., slip op. at 29.

[*74] range of reasonable reserve estimates for the purpose of expressing an opinion on whether the loss reserve estimate computed by Mr. Tures and adopted by Acuity's management without change was reasonable. He did not compute a range for the purpose of entering it on petitioner's Federal income tax return or Acuity's Annual Statement.

Furthermore, we find that Mr. Kryczka's range was reasonable. He computed a range with a width of approximately 14.6% as a percentage of the lower bound.[64] Respondent attacks the reasonableness of Mr. Kryczka's range and the ranges computed by petitioner's two actuarial experts (which had widths of 20.6% and either 21.3% or 22.2% as discussed infra) in the same section of his brief and argues that a "range with a spread that exceeds 20% of the lower bound is unwarranted in this case and is simply provided by petitioner's actuaries to encompass its Carried Reserve." Respondent offers no explanation as to how he arrived at a seemingly arbitrary 20% cap, and he cites no authority in support of that figure. Furthermore, Mr. Kryczka's range with a width of 14.6% would, in fact, be reasonable under respondent's 20% cap.

---

[64] Mr. Kryczka computed a range from $577,108,000 to $661,329,000 ($661,329,000 - $577,108,000 / $577,108,000 = 14.6%).

[*75]   Petitioner argues that Mr. Kryczka's range (as well as the ranges of its two actuarial experts) are reasonable under our caselaw.  In Utah Med., the taxpayer's actuary at Tillinghast computed ranges with widths of approximately 26.1% and 26.3% for the two years in issue.[65]  See Utah Med., slip op. at 12.  We characterized the ranges as "large" but found that they were reasonable because the high amount of uncertainty in the taxpayer's business made "projecting losses difficult."[66]  See id. at 24.  In contrast, in Minn. Lawyers, the taxpayer's actuary at KPMG computed ranges with widths of approximately 70.3% and 119.9% for the second

---

[65]   The actuary computed a range from $45,426,000 to $57,289,000 ($57,289,000 - $45,426,000 / $45,426,000 = 26.1%) for the first year in issue and a range from $49,066,000 to $61,948,000 ($61,948,000 - $49,066,000 / $49,066,000 = 26.3%) for the second year in issue.  See Utah Med., slip op. at 12.

[66]   We found that:  (1) the taxpayer was a relatively modestly capitalized, single-line insurer serving a limited geographic area; (2) the taxpayer had claims with a relatively low frequency and high severity; and (3) the taxpayer issued policies in a highly risky and longer-tailed line of insurance.  See Utah Med., slip op. at 24.

[*76] and third years in issue.[67]  See Minn. Lawyers, slip op. at 18, 37 n.26.  We

stated that

> [r]elative to the recommended range[s] of the taxpayer's actuary in
> Utah Medical, * * * [the KPMG actuary's] recommended ranges are
> very large.  The evidence in the record is insufficient for us to
> evaluate adequately whether * * * [the] recommended ranges are so
> large as to be unreasonable, or whether every point in each
> recommended range would satisfy the requirement that the
> determination of unpaid losses 'represent actual unpaid losses as
> nearly as it is possible to ascertain them.'  [Fn. ref. omitted]

Id. at 37-38.

Mr. Kryczka's range (as well as the ranges of petitioner's two actuarial

experts) are narrower than the ranges that we found to be reasonable in Utah Med.

and significantly narrower than the ranges that we did not approve of in Minn.

Lawyers.  And while Acuity was a more diversified insurance company than the

taxpayer in Utah Med., there was still a significant degree of uncertainty in

estimating Acuity's loss reserves for 2006.

SSAP No. 55 makes clear that loss reserves are inherently uncertain.

Moreover, sources of uncertainty particular to Acuity's business in 2006 included:

---

[67]  For the first year in issue, the taxpayer's actuary at Milliman did not
compute a range.  See Minn. Lawyers, slip op. at 36.  The taxpayer's actuary at
KPMG computed a range from $7,956,093 to $13,550,446 ($13,550,446 -
$7,956,093 / $7,956,093 = 70.3%)  for the second year in issue and a range from
$5,851,559 to $12,867,450 ($12,867,450 - $5,851,559 / $5,851,559 = 119.9%) for
the third year in issue.  See id. at 18.

**[\*77]** (1) Acuity's rapid growth; (2) Acuity's expansion into new States; (3) Acuity's dramatic shift towards riskier, long tail coverage lines of insurance; (4) the decreasing frequency and increasing severity of claims in workers compensation, Acuity's largest line of insurance; and (5) the rising litigation costs in Illinois, Acuity's second-largest State by written premiums. ASOP 36, sec. 3.6, states that an "actuary should consider the implications of uncertainty in loss and loss adjustment expense reserve estimates in determining a range of reasonable reserve estimates". We find that Mr. Kryczka (as well as petitioner's two actuarial experts) properly considered the uncertainties in Acuity's business and computed reasonable ranges of reserve estimates.

E.   Respondent's Other Arguments

Respondent argues that Mr. Kryczka's actuarial analysis was "flawed and biased." Respondent takes issue with a number of the assumptions and selections in Mr. Kryczka's analysis, in much the same fashion as he did with Mr. Tures' analysis. For example, respondent asserts that Mr. Kryczka selected loss development factors and loss ratios in excess of Acuity's historical experience. However, SSAP No. 55 specifically provides that a loss reserve estimate shall be computed "using past experience adjusted for current trends, and any other factors that would modify past experience." Likewise, ASOP 36, sec. 3.5.2, provides that

**[*78]** an "actuary should consider the likely effect of changing conditions on the subject loss and loss adjustment expense reserves."

Mr. Kryczka credibly testified that a "mechanical approach would just be to select one of the [historical] averages, but we were incorporating judgment as well." He and his team met with Acuity's management and its actuarial team. He learned of the changes taking place in Acuity's business, including the increasing severity in the workers compensation line of insurance, the double digit growth, and the expansion into new States. Then, using his best professional judgment, he adjusted Acuity's historical data to account for these changes in making his selections. We find that his selections were appropriate and reasonable.

Respondent argues that Acuity did not provide PwC with a copy of the Best letter. This argument is a red herring. The Best letter contains financial information on Acuity, much of which is not related to the computation of loss reserves. Ms. Schuler wrote the Best letter to assist Mr. Altonji and his team with their financial review of Acuity for 2006. Acuity provided Mr. Kryczka with its actual data--the same data that Mr. Tures used in his actuarial analysis. Furthermore, Mr. Kryczka and his team personally met with Acuity's management "to understand what is going on with the company in order to make the proper actuarial judgments".

**[\*79]** F.  Conclusion on Mr. Kryczka's Actuarial Analysis and Determination

Mr. Kryczka performed his actuarial analysis in accordance with the ASOPs.  He computed a range of reasonable reserve estimates from $577,108,000 to $661,329,000.  Acuity's carried loss reserves fell within his range.  His range was reasonable--respondent's arguments to the contrary are all unconvincing.  We find the foregoing to be substantial evidence that Acuity's carried loss reserves for 2006 are fair and reasonable.  See supra pp. 52-53.

V.  Financial Audit

Petitioner argues that "PwC's unqualified 2006 statutory and GAAP audit opinions give the Court an additional level of support, specifically from an accounting perspective, for the conclusion that Acuity's 2006 loss reserve of $660.6 million was a fair and reasonable estimate."  Respondent argues that petitioner misconstrues the scope of financial and statutory audits.  Respondent further argues that Tom Brown and his team tested data, controls, and the accuracy of claim recording and not the reasonableness of Acuity's carried loss reserves.

Tom Brown did not perform an independent actuarial analysis.  He relied on Mr. Kryczka to opine on the reasonableness of Acuity's loss reserves.  We have already concluded that Mr. Kryczka's actuarial analysis and determination is entitled to substantial weight.  Additional weight given to PwC's unqualified

**[\*80]** opinions would be duplicative. While respondent does not seem to question the integrity of Acuity's actual data, we note that PwC's unqualified opinions affirm that the actuaries in this case could reasonably rely on Acuity's actual data, where appropriate, in their actuarial methodologies.

VI.     Subsequent Loss Reserve Development

Respondent argues that "[a]lthough hindsight certainly does not decide the valuation question herein, * * * [Acuity's] subsequent reduction of the 2006 Carried Reserve by over $79 million is relevant to * * * [Acuity's] pattern of continued over-reserving in spite of repeated confirmation that its actuarial assumptions are biased high." Respondent further argues that "[h]indsight may also show a continued pattern of ignoring repeated overstatements." We reject respondent's characterization of Acuity's favorable development as a "pattern of continued over-reserving" and the implication that Acuity's carried loss reserves for 2006 are thus unreasonable.

Mr. Altonji credibly testified from a financial analyst's perspective that a long history of favorable development is not an indication that an insurance company's loss reserves were excessive or unreasonable when originally

[*81] established.[68]  He further credibly testified that "[e]very single actuary is always wrong, because no one knows for sure with 100 percent certainty that * * * [a loss] reserve is adequate until the time passes."  Anthony Grippa, one of respondent's actuarial experts (discussed infra) credibly testified that "the end result, when all the claims are finally paid out, the chance that the end result will be exactly the same as my number [for the loss reserves] is infinitesimally small."

An insurance company will virtually always experience some measure of favorable or unfavorable development on its loss reserves as new information comes to light.  Federal tax law thus requires loss reserves to be the "best possible"--it does not require that an insurance company guess its loss reserves exactly right.  See Physicians Ins., slip op. at 23-24.  Respondent has not cited a single authority, nor can we find any, for the proposition that unfavorable development in consecutive years, or favorable and unfavorable development in alternating years, is reasonable whereas favorable development in consecutive years indicates "a pattern of continued over-reserving" and is somehow unreasonable.  Respondent essentially reads into the Federal tax law a requirement that does not exist; that is, a requirement that an insurance company record its best

---

[68]  In fact, for purposes of the BCAR analysis, Best determined that Acuity's carried loss reserves for 2006 might be deficient by 0.30% or $1,980,000.

**[\*82]** estimate of its loss reserves without going over the amount that in hindsight turns out to be the correct amount.

Petitioner argues that "favorable reserve development considered in 'hindsight' does not make a loss reserve estimate unreasonable if the taxpayer shows that it was reasonable when established." We agree. See id. at 39; Utah Med., slip op. at 29. Petitioner also argues that the development of Acuity's carried loss reserves for 2006 closely matches reserve development in the property and casualty insurance industry. Petitioner asserts that "to the extent post-2006 reserve development is considered by the Court at all * * * [it is] a factor that confirms Acuity's 2006 loss reserve as a fair and reasonable estimate."

Petitioner introduced expert testimony and other evidence on loss reserve development in the property and casualty insurance industry as a whole and the segment of the industry reporting net earned premiums between $100 million and $1 billion in 2006. Respondent challenges the evidence upon which petitioner relies, arguing that the evidence does not provide a valid basis of comparison to Acuity and that the evidence is contradicted by other evidence in the record. Respondent further argues that it is a "logical fallacy" to presume that "because everyone else is doing it, therefore it must be reasonable."

**[*83]**  In <u>Utah Med.</u>, slip op. at 26, we found that the medical malpractice insurance industry overstated reserves to virtually the same extent as the taxpayer, which suggested that the taxpayer's loss reserves were fair and reasonable. However, the taxpayer in that case wrote policies primarily in a single line of insurance (medical malpractice) and primarily in a single State (Utah) during the years in issue.  <u>See</u> <u>id.</u>, at 4.  Acuity is a larger and more diversified insurance company.  In 2006 Acuity wrote policies in fifteen lines of insurance as reported on its Annual Statement and in fifteen different States.

There is insufficient evidence in the record for us to determine whether Acuity was similarly situated to the property and casualty industry as a whole or to the segment of the industry reporting net earned premiums between $100 million and $1 billion for 2006.  <u>Cf.</u> <u>Minn. Lawyers</u>, slip op. at 41 (the taxpayer's expert witness's report and testimony "provide little basis for assessing whether his peer-group ratio comparisons account for possible differences in reserving, claim management, and underwriting philosophies among the eight companies that he selected for comparison, or whether those eight companies are in fact the appropriate peer group.").

**[\*84]**  In sum, we find that the subsequent development of Acuity's 2006 carried loss reserves has little probative value, one way or the other, in determining whether the reserves were fair and reasonable when originally established.

VII.  Expert Witnesses

Both parties called expert witnesses to offer their opinions regarding the reasonableness of Acuity's carried loss reserves.  We evaluate expert opinions in light of all the evidence in the record, and we may accept or reject the expert testimony, in whole or in part, according to our independent evaluation of the evidence in the record.  See Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938); Malachinski v. Commissioner, 268 F.3d 497 (7th Cir. 2001), aff'g T.C. Memo. 1999-182; Estate of Davis v. Commissioner, 110 T.C. 530, 538 (1998).

Petitioner offered expert testimony of two qualified and credentialed actuaries--Katharine Barnes, FCAS, MAAA, and Brian Z. Brown, FCAS, MAAA (Mr. Brown).  Respondent likewise offered expert testimony of two qualified and credentialed actuaries--Matthew P. Merlino, FCAS, MAAA, and Anthony J. Grippa, FCAS, MAAA.

[*85]   A.   <u>Ms. Barnes' Actuarial Analysis</u>

Ms. Barnes is a consulting actuary and director at Towers Watson.[69]  She received a bachelor's degree in mathematics from Wellesley College in 1981 and a Master's degree in mathematics from Brandeis University in 1983.  She has 28 years of actuarial experience in loss reserving and pricing for property and casualty insurance companies.

Ms. Barnes performed an independent actuarial analysis in accordance with ASOP 43 and the revised edition of ASOP 36, both of which had become effective by that time.  She computed estimated ultimate losses using nine accepted actuarial methodologies:  (1) paid loss development method (unadjusted); (2) adjusted paid loss development method; (3) reported loss development method (unadjusted); (4) adjusted reported loss development method; (5) paid BF method (unadjusted); (6) adjusted paid BF method; (7) reported BF method (unadjusted); (8) adjusted reported BF method; and (9) frequency times severity method.[70]  In her best professional judgment, she ultimately decided to rely upon the results of the four adjusted methods and the frequency times severity method.

---

[69]  Tillinghast was a predecessor firm to Towers Watson.

[70]  Ms. Barnes used other accepted actuarial methodologies in computing estimated ultimate ALAE, ULAE, and S & S.

**[\*86]** Ms. Barnes persuasively explains in her expert report why she rejected the unadjusted methods as being unreliable:

> Acuity Mutual experienced significant growth between approximately 2000 and 2006. For example, the Company's earned premium volume for 2006 was more than three times the 2000 earned premium for workers compensation and general liability insurance. Similar and even greater growth was experienced in other lines of business. Much of the growth was in states other than the historical Wisconsin base. I have observed that the non-Wisconsin business exhibits different characteristics than the historic Wisconsin business (e.g., loss development, claim severity). As a result, the historical development patterns that are based predominantly on Wisconsin experience are not representative of the future development of losses to be expected for Acuity Mutual as of year-end 2006.

> \*　　\*　　\*　　\*　　\*　　\*　　\*

> My analysis shows that the Company experienced significant changes in the frequency of claims (number of claims per insured exposure unit or policy) and in the severity of claims (average loss per claim) in recent accident years as of year-end 2006. I have noted that the frequency of claims dropped significantly while the average cost of reported claims (i.e., severity) increased. \* \* \* These types of changes (lower frequency and higher severity) occurring simultaneously cause a low bias to occur with the traditional [unadjusted] actuarial development techniques, since the lower frequency phenomenon will likely be reflected in the actuarial data sooner than the higher severity.

In the adjusted methods, Ms. Barnes adjusted Acuity's loss and LAE data to account for these and other "substantial changes in the Company's operation and business". Her adjustments are supported by ASOP 43, sec. 3.6.7, which states

[*87] that an "actuary should consider whether there have been significant changes in conditions, particularly with regard to claims, losses, or exposures, that are likely to be insufficiently reflected in the experience data or in the assumptions used to estimate the unpaid claims."

In her expert report, Ms. Barnes computed a range of reasonable reserve estimates from $560,662,380 to $681,770,059. The revised edition of ASOP 36, sec. 3.7, states that an "actuary should consider a reserve to be reasonable if it is within a range of estimates that could be produced by an unpaid claim estimate analysis that is, in the actuary's professional judgment, consistent with both ASOP No. 43, Property/Casualty Unpaid Claim Estimates, and the identified stated basis of reserve presentation."[71] Ms. Barnes determined that Acuity's carried loss reserves fell within her range and concluded that the reserves represent a "fair and reasonable estimate of amounts the Company will be required to pay after 2006 to settle claims incurred as of year-end 2006."

Mr. Merlino found a technical error in Ms. Barnes' analysis relating to the conversion of loss reserves on a gross basis to a net basis. In his rebuttal report, he proposed corrections to fix the error using alternative net-to-gross ratios. His

---

[71] Under ASOP 43, sec. 3.7.3, a range of estimates is an appropriate stated basis of reserve presentation.

[*88] proposed corrections result in a downward adjustment to Ms. Barnes' range of $19,792,000 on the low end and $21,014,000 on the high end. After applying his corrections, he computed Ms. Barnes' range to be $540,870,000 to $660,756,000.[72]

Ms. Barnes admits that she made a technical error in her expert report in applying her selected net-to-gross ratios, which resulted in an inconsistency between her gross and net paid losses.[73] To correct the error, she produced at trial a revised report in which she applied her net-to-gross ratios to the gross unpaid losses instead of the gross ultimate losses. Her corrections result in a downward adjustment to the range she computed of $1,529,038 on the low end and $3,292,757 on the high end. After applying her corrections, she computed a revised range of reasonable reserve estimates from $559,133,342 to $678,477,302. She credibly testified at trial that Acuity's carried loss reserves for 2006 fall within her revised range and thus her opinion that Acuity's reserves are reasonable has not changed.

---

[72] Mr. Merlino notes in his rebuttal report that "[a]dditonal adjustment to ALAE may be necessary", but he does not offer any further explanation or propose any additional adjustments.

[73] Ms. Barnes described the error as a spreadsheet error.

**[*89]**    Respondent argues that "Ms. Barnes attempted to fix the problem" that Mr. Merlino found but "failed to correct the problem; doing so properly would have meant that the Carried Reserve exceeded her high estimate."  Respondent asserts that Mr. Merlino's proposed corrections "resulted in a reduction of * * * [Ms. Barnes'] range by over $19 million at the low end and $21 million at the high end; the change to the high end reduces [it] to $658 million, meaning that the Carried Reserve is higher than the corrected range."

Respondent has not shown any computation nor offered any explanation as to how he arrived at $658 million for the high end of Ms. Barnes' range. Respondent cites pages 4-7 and exhibit 2 of Mr. Merlino's rebuttal report; however, these show Mr. Merlino's computation of his proposed corrections and not Ms. Barnes' range after applying the proposed corrections.

In exhibit 1 of his rebuttal report, Mr. Merlino "compiled comparisons of reserves by component and by reserving segment."  He states:  "In my comparisons * * * for Barnes I used adjusted net reserves by line consistent with the corrections discussed previously."  He shows the low end of Ms. Barnes' range to be $540,870,000 and the high end to be $660,756,000.[74]  We arrive at the same

---

[74]  These amounts are also consistent with the percentages Mr. Merlino computed for Ms. Barnes' range in table 9 of his rebuttal report.

**[*90]** amounts when rounding to the nearest thousand (low end: $560,662,380 - $19,792,000 = $540,870,380; high end: $681,770,059 - $21,014,000 = $660,756,059). Moreover, regardless of whether we accept Mr. Merlino's proposed corrections or Ms. Barnes' proposed corrections, Acuity's carried loss reserves for 2006 fall within Ms. Barnes' range of reasonable reserve estimates as corrected.

Respondent makes a number of additional arguments as to why Ms. Barnes' range is unreasonable. We find these arguments to be unpersuasive. Respondent argues that Ms. Barnes' assumptions and selections were biased high. However, as described <u>supra</u> p. 86, Ms. Barnes explains in her expert report the factors she considered and the judgment she employed in making her selections. We find them to be reasonable.

Respondent also argues that Ms. Barnes' range was too wide. She explains in her expert report that the "internal and environmental changes [in Acuity's business] create additional uncertainty in the estimation of the liabilities, and therefore cause the range of estimates considered to be reasonable to be wider than it would be with more stable conditions." We compute the width of her range to be 21.3% in applying her corrections ($678,477,302 - $559,133,342 / $559,133,342 = 21.3%) or 22.2% in applying Mr. Merlino's corrections ($660,756,000 -

**[\*91]** $540,870,000 / $540,870,000 = 22.2%). Either way, her range as corrected is narrower than the ranges we found to be reasonable in <u>Utah Med.</u> and, as described <u>supra</u> pp. 73-77, we find it to be reasonable in this case.

In sum, we find that Ms. Barnes' actuarial analysis supports petitioner's position that Acuity's carried loss reserves for 2006 are fair and reasonable.

B.    Mr. Brown's Actuarial Analysis

Mr. Brown is a consulting actuary and principal at Milliman. He received a bachelor's degree in economics from Illinois State University in 1980. He has over 25 years of actuarial experience in loss reserving and pricing for property and casualty insurance companies. He served on the board of directors of the CAS from 2006 to 2009.

Mr. Brown performed an independent actuarial analysis in accordance with ASOP 43 and the revised edition of ASOP 36.[75] Before performing his

---

[75] Mr. Brown did not review Acuity's homeowners, commercial auto physical damage, or personal auto physical damage lines of insurance. These lines are all short tail coverage lines of insurance with a far lower degree of uncertainty than Acuity's other lines. The portion of Acuity's carried loss reserves for 2006 attributable to these lines is $11.5 million. He also did not review Acuity's ULAE of $37.6 million. He accepted Acuity's estimates for the three lines and ULAE without review. In his expert report, he states that "it is professionally appropriate to review 90%-95% of the reserves for a client and rely on the client's estimate for a small percentage of the reserves." He relies on ASOP 43, sec. 3.4, which states in pertinent part that an "actuary may choose to disregard items that, in the

(continued...)

[*92] analysis, he met with members of Acuity's management, its claims and underwriting departments, and its actuarial team. He then used his best professional judgment in selecting loss development factors, expected loss ratios, frequency and severity trends, and other inputs. He used six accepted actuarial methods to compute estimated ultimate losses: (1) paid loss development method; (2) incurred loss development method; (3) frequency and severity method; (4) loss ratio method; (5) paid BF method; and (6) incurred BF method. He used three additional accepted actuarial methods to compute estimated ultimate ALAE and S & S.

He arrived at a range of reasonable reserve estimates from $572,102,336 to $689,721,061. He determined that Acuity's carried loss reserves fell within his range and concluded that the reserves were reasonable. He credibly testified that in

_____

[75](...continued)
actuary's professional judgment, are not material to the unpaid claim estimate given the intended purpose and use." On brief, respondent does not challenge Mr. Brown's judgment in accepting Acuity's estimates for the three lines and the ULAE. We treat respondent's silence as a concession that Mr. Brown's judgment on this matter was appropriate and reasonable. See Rule 151(e)(4) and (5); Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989).

**[\*93]** his professional opinion any loss reserve estimate that falls within the range he computed is reasonable.[76]

Respondent argues that Mr. "Brown's assumptions and selections are biased so high that his estimate does not represent actual unpaid losses, nor does it represent unpaid losses as nearly as possible to ascertain them given the size of his range."[77] We disagree. Mr. Brown's assumptions were informed by his meetings with key personnel at Acuity and his selections were the product of those assumptions and his best professional judgment. We find them to be reasonable.

---

[76] He credibly testified that to the best of his knowledge the term "fair and reasonable" is not used in the actuarial literature.

[77] One selection that respondent questions in particular is Mr. Brown's asbestos and environmental (A & E) reserve segment of $7,434,000 to $10,888,000. Acuity's claims department did not establish a case reserve for asbestos liability. It established a case reserve of $889,113 for environmental liabilities. Mr. Brown determined in his best professional judgment that Acuity faces potential exposure to A & E liabilities in excess of Acuity's case reserves. He stated in his expert report that "[a]sbestos claims and pollution claims are significantly different from the rest of Acuity's claims. The payments in 2006 and beyond are due to events from older accident years. Asbestos disease typically takes 10 or 20 or more years to manifest and pollution at a site may take decades to discover." He used three industry-based methods to compute the A & E reserve segment: (1) A.M. Best survival ratio method; (2) exposure-adjusted survival ratio method; and (3) market share method. On the basis of the foregoing, we cannot say that Mr. Brown's judgment in including an A & E reserve segment was unreasonable. Furthermore, even assuming arguendo that an A & E reserve segment was unnecessary, and that segment was removed from Mr. Brown's range, Acuity's carried loss reserves for 2006 would still fall within Mr. Brown's range as recomputed.

[*94] We compute the width of Mr. Brown's range to be 20.6% ($689,721,061 -

$572,102,336 / $572,102,336 = 20.6%). His range is narrower than the ranges we

found to be reasonable in Utah Med. and, as described supra pp. 73-77, we find it

to be reasonable in this case.

Separately from his actuarial analysis, Mr. Brown reviewed Mr. Tures'

workpapers. He determined that Mr. Tures' analysis "consisted of professionally

recognized and commonly utilized actuarial methods applied appropriately to the

data at hand." He determined that Mr. Tures' analysis was "well documented and

can be followed by another actuary qualified to perform reserve analyses." He did

not observe any kind of hidden margin within Mr. Tures' actuarial analysis. While

he did not agree with every one of Mr. Tures' selections, he determined that the

selections were reasonable in total.[78]

He found that Mr. Tures' best estimates for Acuity's commercial auto

liability and property reserve segments exceeded the upper bound of his range for

those segments. He opined that in his experience an insurance company's loss

---

[78] Mr. Brown noted in his expert report and credibly testified at trial that he would have selected higher values for some of Mr. Tures' selections and lower values for others. In his rebuttal report Mr. Grippa points out that "there are literally thousands of individual selections (judgments) made by each actuary in arriving at his/her estimates of loss reserves." Common sense dictates that one would not expect two actuaries to arrive at identical values for every one of the thousands of individual selections.

[*95] reserves for a particular segment commonly fell outside of his range even though the company's total reserves fell within his range. He determined that Mr. Tures' expected loss reserves (i.e., Mr. Tures' total reserves for all segments including LAE) fell within his range and thus concluded that the reserves were reasonable. His conclusion is consistent with our caselaw, under which "the aggregate unpaid loss reserves for all lines of business for the applicable year, and not the individual reserves for each line of business, must meet the fair and reasonable test, Hanover Ins. Co. v. Commissioner, 69 T.C. at 271; Western Casualty Surety Co. v. Commissioner, 65 T.C. at 917, 919". Hosp. Corp. of Am. v. Commissioner, T.C. Memo. 1997-482, slip op. at 90.

In sum, we find that Mr. Brown's actuarial analysis and his review of Mr. Tures' workpapers support petitioner's position that Acuity's carried loss reserves for 2006 are fair and reasonable.

C.   Mr. Merlino's and Mr. Grippa's Actuarial Analyses

Mr. Merlino is a consulting actuary at Merlinos & Associates, Inc. He received a bachelor's degree in applied mathematics from Brown University in 1978. He has 30 years of experience as an actuarial consultant, a substantial portion of which is in the field of loss reserving for property and casualty insurance companies. Mr. Grippa is a principal at Strategic Actuarial & Risk Consultants,

**[\*96]** LLC.  He received a bachelor's degree in economics from Tulane University.  He has over 30 years of actuarial and insurance management experience, including 21 years at the National Council on Compensation Insurance.

Mr. Merlino and Mr. Grippa each performed an independent actuarial analysis.  Like Ms. Barnes, they each made technical errors in their analysis that they later corrected.  Mr. Merlino computed a range from $544,600,000 to $602,200,000 around a central estimate of $573,800,000.  Mr. Grippa did not compute a range.  He computed a central estimate of $561,692,000 and an estimate at the 75th percentile confidence level of $587,798,000.  Mr. Merlino and Mr. Grippa determined that Acuity's carried loss reserves for 2006 exceeded the upper bound of their range and estimate at the 75th percentile confidence level, respectively.

Respondent argues that Mr. Grippa "determined a central estimate for * * * [Acuity] that is fair and reasonable and that represents actual unpaid losses of * * * [Acuity].  His estimate is supported by respondent's other expert actuary, Matthew Merlino."  On the other hand, petitioner argues that Mr. Grippa's selections were "aggressively low" and that his estimate at the 75th percentile confidence level is "inconsistent with standard actuarial practice."  Petitioner further argues that Mr. Merlino evidenced a "low bias" in his selections, failed to

[*97] take into account the changes in Acuity's business, and computed an "unreasonably narrow range".

We perceive no need to address these arguments because neither Mr. Merlino's nor Mr. Grippa's actuarial analysis convinces us that Acuity's carried loss reserves for 2006 were anything other than fair and reasonable. The applicable regulations require the taxpayer to show that its loss reserves are fair and reasonable and represent only actual unpaid losses. Where, as here, the taxpayer has made such a showing, "our inquiry ends." Utah Med., slip op. at 32. The applicable regulations do not require a taxpayer to show that the amount espoused by the Commissioner as a fair and reasonable loss reserve estimate is, in fact, not fair or reasonable. Thus, we need not and do not decide whether Mr. Merlino's or Mr. Grippa's loss reserve estimate would also be fair and reasonable.

VIII.    Conclusion

Petitioner introduced substantial evidence in support of its position that Acuity's carried loss reserves for 2006 are fair and reasonable and represent only actual unpaid losses. Mr. Tures' actuarial computation of his expected loss reserves in accordance with the NAIC rules and ASOPs, and Acuity's adoption of that amount without change as its carried loss reserves, strongly support petitioner's position. Mr. Kryczka's determination that Acuity's carried loss

[*98] reserves fell within his range of reasonable reserve estimates actuarially computed in accordance with the ASOPs strongly supports petitioner's position. Ms. Barnes' and Mr. Brown's actuarial analyses and expert opinions that Acuity's carried loss reserves are reasonable further support petitioner's position. Respondent has not introduced any persuasive evidence to the contrary. On the basis of the foregoing, we hold that Acuity's carried loss reserves of $660,639,385 for 2006 are fair and reasonable and represent only actual unpaid losses within the meaning of the applicable regulations.

Because the parties settled some issues before trial,

Decision will be entered under

Rule 155.